CANE TENNESSEE, INC.,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–237 L.

United States Court of Federal Claims.

June 27, 2003.

Charles F. Lettow, Washington, DC, for plaintiffs. Matthew D. Slater, Washington, DC, of counsel.

Kristine S. Tardiff, with whom were Thomas L. Sansonetti, Assistant Attorney General, United States Department of Justice, Washington, DC, for defendant. Daniel W. Kilduff, Office of the Solicitor, United States Department of the Interior, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

Before the court is Defendant's Motion for Summary Judgment as to the Claims of Plaintiffs Cane and Colten (Def.'s MSJ or defendant's Motion) and plaintiffs' Cross–Motion by Cane and Motion by the Wyatts and the Wyatt Trusts for Partial Summary Judgment that the Main Tract and the Rainey Ridge Tract Constitute Different "Parcels" and are the Only Parcels Relevant to their Claims (Pls.' Cross–Motion or plaintiffs' Cross–Motion). Cane Tennessee, Inc. (Cane) and Colten, Inc. (Colten) own property in Bledsoe County, Tennessee. The property was previously owned by the Wyatts or the Wyatt Trusts, who continue to own mineral royalty interests in the property. *See* Pls.' Cross–Motion at 5–7.

In two of the three complaints filed in this case, plaintiffs allege that the government permanently took their property without compensation when the Secretary of the In-

terior (Secretary) designated portions of their property as unsuitable for surface mining (Unsuitability Determination), and temporarily took their property without compensation during the unsuitability petition process. Complaint in Case No. 00–513 L (2000 Compl.) (alleging taking of Cane's and Colten's properties based on the Secretary's Unsuitability Determination); Complaint in Case No. 02–945 L (2002 Compl.) (alleging taking of Wyatts' and Wyatt Trusts' mineral royalty interests based on the Secretary's Unsuitability Determination). The earliest complaint alleges a taking based on the government's conduct during the Surface Mining Control and Reclamation Act (SMCRA) permitting process involving Cane's and Colten's lessees. Complaint in Case No. 96–237 L (1996 Compl.).

Both the Cane and Colten properties comprise several tracts. *See* Plaintiffs' Appendix to Their Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of their Cross–Motion for Partial Summary Judgment (Pls.' Exh.) 53 at 1381. At issue in the pending motions are the Main Tract and Rainey Ridge Tract as to Cane, the Wyatts, and the Wyatt Trusts, and the Little Mountain Tract as to Colten. *See* Pls.' Cross–Motion *passim.* The majority of the tracts in the Cane property, including the Main Tract and Rainey Ridge Tract, are not contiguous. *See* Pls.' Exh. 53 at 1381. The Wyatts as individuals hold a 3.5% mineral royalty interest in the Main Tract, and the Wyatt Trusts own a 3.5% mineral royalty interest in the Rainey Ridge Tract and two other tracts that are part of the Cane property. Pls.' Cross–Motion at 18; 2002 Compl. ¶¶ 10, 28.[1]

This case has already been the subject of two summary judgment motions.[2] The more recent motion, decided on October 2, 2002, addressed the 2000 complaint. *See Cane Tenn., Inc. and Colten, Inc. v. United States,* 54 Fed.Cl. 100 (2002) (*Cane II*). In its opinion, the court found that the "denominator" for purposes of the takings analysis was governed by the "parcel as a whole" rule. *Id.* at 105. With respect to the Cane property, the court found that there remained an economically viable use for the land and therefore the court must utilize the *Penn Central* test, *Pennsylvania Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), to determine whether a taking has occurred. *See id.* at 108, 98 S.Ct. 2646 (rejecting use of an alternative test based on *Whitney Benefits v. United States,* 18 Cl.Ct. 394 (1989)). As to the Colten property, the court left open the possibility that the land retained no economically viable use as a result of the government action. *Id.* at 109, 98 S.Ct. 2646. Finally,

---

1. The Wyatts as individuals are Mary Anne Wyatt, Nancy Wyatt Zorn, and Wilson W. Wyatt, Jr., the children of the Wilson W. Wyatt, Sr. and Anne D. Wyatt (the Senior Wyatts). 2002 Compl. ¶ 4. These three individuals received their property interests for purposes of this case in 1991, when a reserved mineral royalty interest in the Main Tract of the Cane property was deeded to them in three equal shares by the Senior Wyatts. 2002 Compl. ¶ 28. These three individuals are also the beneficiaries of three trusts established by the Senior Wyatts in 1973. 2002 Compl. ¶ 5. Wilson W. Wyatt, Jr. was and is the Trustee of each of these trusts. 2002 Compl. ¶ 5. The Wyatt Trusts received their property interests for purposes of this case in February, 1979, when the property at issue was sold to Cane.2002 Compl. ¶ 10. Neither the Wyatts nor the Wyatt Trusts make any claims with respect to the Colten property. 2002 Compl. ¶ 13. The claims of the Wyatts and the Wyatt Trusts differ from those of Cane and Colten. The Wyatts and the Wyatt Trusts hold only mineral royalty interests. 2002 Compl. ¶¶ 10, 28. Therefore, any timber or resale value of the land is immaterial.

2. The first round of summary judgment briefing under the 1996 complaint involved an alleged taking based on the government's failure to grant plaintiffs a permit to mine on their land. *Cane Tenn., Inc. and Colten, Inc. v. United States,* 44 Fed.Cl. 785, 787 (1999) (*Cane I*). The court held that Colten's claim of a taking was not ripe because it did not apply for a permit to mine. *Id.* at 790. The court denied summary judgment as to Cane because Cane's lessee did apply for a mining permit that was denied. *Id.* at 794. The court also denied summary judgment as to the Cane property on the affirmative defense of laches because defendant's motion raised genuine issues of material fact. *Id.* at 796. A subsequent decision by the Federal Circuit finding that Cane's lessee had not suffered a taking as a result of the government's failure to grant it a permit to mine on Cane's property effectively disposed the takings claim in the 1996 complaint. *See generally Wyatt v. United States,* 271 F.3d 1090 (Fed. Cir.2001) (*Wyatt*); *see also infra* note 4.

the court ruled that a temporary taking could not have occurred prior to October 5, 1995. *Id.* at 112, 98 S.Ct. 2646.

In its current motion, defendant seeks to resolve all remaining issues under the *Penn Central* test as to Cane and Colten. First, defendant argues that under *Penn Central* the Secretary's Unsuitability Determination did not result in a permanent taking of Cane's property. Def.'s MSJ at 28–41. Defendant also argues that *Penn Central* is the proper framework within which to analyze whether the Unsuitability Determination resulted in a taking of the Colten property and, under that standard, argues that summary judgment of no taking should be granted. *Id.* at 41–49. Finally, the government argues that "extraordinary delay" is a required element of plaintiffs' temporary takings claim and, since there was no extraordinary delay, there was no temporary taking. *Id.* at 49–59.

Plaintiffs argue that the only issue ripe for summary judgment is a determination of the relevant parcel as to the Cane property. Pls.' Cross–Motion at 25–31. Plaintiffs also argue that because the various parcels included in Cane's property are not contiguous, the property as a whole cannot be viewed as the relevant parcel. *Id.* at 25–

30. Plaintiffs also argue that with respect to both the Cane and Colten properties, disputed issues of material fact preclude summary judgment at this time. *Id.* at 31–56. Finally, plaintiffs argue that extraordinary delay is not an essential element of its temporary takings claim and, even if it is, they should be able to go forward on either a temporary takings or a "rolling moratoria" [3] claim. *Id.* at 56–63.

For the following reasons, Defendant's Motion for Summary Judgment as to the Claims of Plaintiffs Cane and Colten is GRANTED. Plaintiffs' Cross–Motion by Cane and Motion by the Wyatts and the Wyatt Trusts for Partial Summary Judgment that the Main Tract and the Rainey Ridge Tract Constitute Different "Parcels" and are the Only Parcels Relevant to Their Claims is DENIED.

I.  Background [4]

Cane and Colten are incorporated in the state of Delaware and owned by the same individual investor. 2000 Compl. ¶¶ 4, 8. The property at issue in this litigation belonged to the Wyatt family (the Wyatts) and was purchased by Cane from the Wyatts directly and by Colten after an intermediate transaction.[5] 2000 Compl. ¶¶ 1, 4, 8.

3. A "rolling moratoria" claim comprises a series of successive government actions that become the functional equivalent of a permanent taking, as discussed in dicta by the Supreme Court in *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 333–334, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

4. The facts contained in this section and in this opinion are only those pertinent to the relevant parcel and temporary taking issues raised in the briefs. Facts cited to the pleadings of only one party do not appear to be in dispute. Additional facts in this matter can be found at *Wyatt v. United States,* 271 F.3d 1090 (Fed.Cir.2001) (*Wyatt*), rev'g *Eastern Minerals International, Inc. v. United States* (*Eastern Minerals*), 36 Fed.Cl. 541 (1996), as well as in this court's earlier opinions in *Cane I* and *Cane II*, reported at 44 Fed.Cl. 785 and 54 Fed.Cl. 100. The *Eastern Minerals* litigation was brought by Eastern Minerals, Inc. (Eastern Minerals) and Van Buren, Inc. (Van Buren), the lessees of plaintiffs Cane and Colten. *See Eastern Minerals,* 36 Fed.Cl. at 545. Initially, Cane and Colten did not attempt to join the *Eastern Minerals* litigation, but rather filed their own action in this court on April 30, 1996, giving rise to Case No. 96–237 L. *See Cane*

*I,* 44 Fed.Cl. at 788. After the trial court in *Eastern Minerals* found the United States liable for a taking to Eastern Minerals and to the Wyatts, who held mineral royalty interests in the property leased to Eastern Minerals and Van Buren, Cane and Colten moved to consolidate the two cases. *Id.* That motion was denied on November 20, 1996, *see id.,* and the *Eastern Minerals* case and this case have been litigated on separate tracks. Case No. 96–237 L was transferred to this court on January 27, 1999.

5. Milton Bernos (Bernos) had originally acquired 10,000 acres of mineral rights and 2030 acres in fee simple from the Wyatts. Defendant's Appendix to Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of its Cross–Motion for Partial Summary Judgment (Def.'s Exh.) 13, 14. Colten purchased this property from Bernos in October of 1979. 2000 Compl. ¶ 8. Cane purchased its property directly from the Wyatts, with Bernos acting as a broker for that transaction. *See* Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment Respecting the Timing and Scope of Temporary and Permanent Takings of Plaintiffs'

Wilson W. Wyatt, Sr. and Anne D. Wyatt, his wife (the Senior Wyatts) bought large tracts of land from the heirs of John H. Imman in 1953. Pls.' Cross–Motion at 4. The Senior Wyatts "gradually sold and disposed of tracts and interests in tracts from 1953 to 1991." *Id.* at 5. The 1979 sale of the property involved in this case was the their last major disposition. *Id.*

Cane purchased in fee simple approximately 10,000 acres from the Wyatts for $5.1 million in February of 1979. 2000 Compl. ¶ 4; Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment Respecting the Timing and Scope of Temporary and Permanent Takings of Plaintiffs' Coal Estates and Respecting the "Denominator" Applied to the Takings Analysis (Pls.' Exh.) 10. Under the terms of the purchase agreement, the Wyatts retained a 3.5 % royalty interest in any coal to be mined on the Cane property. *See supra* n. 1; 2000 Compl. ¶ 5; Pls.' Cross–Motion at 18 (showing breakdown of royalty interests among the Wyatts as individuals and the Wyatt Trusts). Colten purchased 2030 acres in fee simple and 10,000 acres of mineral rights from Milton Bernos for $2.5 million on October 17, 1979. Pls.' Exh. 18, 19; Def.'s Exh. 14 at 184.

For both transactions, Citibank prepared investment brochures for prospective purchasers. *See* Pls.' Exh. 7 (Citibank brochure for "10,000 acre coal property," Dec. 1978) (Citibank Cane brochure); Pls.' Exh. 15 (Citibank brochure for "Tennessee Coal Property (II)" May 1979) (Citibank Colten brochure) (together, Citibank brochures). In addition, Citibank contracted with a third party to provide an economic assessment of both transactions. Pls.' Exh. 6 (Behre Dolbear report, Dec. 1978) (Cane Behre Dolbear report); Pls.' Exh. 16 (Behre Dolbear "Economic Assessment of the Coal Underlying the Phase II Transaction," August/September 1979) (Colten Behre Dolbear report) (together, Behre Dolbear reports). The Citibank brochures and the Behre Dolbear reports were important to the individual investor who owns both Cane and Colten, because he has no

known experience with coal mining. Def.'s Exh. 12 at 151.

In February 1979, Cane granted an exclusive leasehold in its mineral interests to Eastern Minerals, a corporation wholly owned by Milton Bernos. Plaintiffs' Proposed Findings of Uncontroverted Fact (Pls.' Facts) ¶ 8. The lease provided for an initial term of twelve years and granted Eastern Minerals the unilateral right to extend the lease for up to four additional ten-year periods. *Id.* In October 1979, Colten granted an exclusive leasehold in its mineral interests for a similar term to Van Buren, also owned by Milton Bernos. Pls.' Facts ¶ 13. By the terms of both leases, the tenants (Eastern Minerals and Van Buren) were required to pay as rent the greater of a fixed minimum rent or 3.5% of revenues from an anticipated coal mining project. 2000 Compl. ¶¶ 7, 10. The leases called for mining operations to begin promptly and for the tenants to mine all the merchantable coal on the respective properties. *Id.*; Pls.' Exh. 12 at 234–36 (as to Cane); Pls.' Exh. 20 at 438–40 (as to Colten).

In 1977, prior to Cane's and Colten's acquisition of the properties at issue, Congress had enacted the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 (1986) (SMCRA), which required permits as a precondition to mining and established a process whereby the Secretary could, upon petition, designate land as unsuitable for surface mining. *See* 2000 Compl. ¶¶ 17, 18. *See also E. Minerals Int'l, Inc. v. United States,* 36 Fed.Cl. 541, 544 (1996), *rev'd on other grounds, Wyatt v. United States,* 271 F.3d 1090 (Fed.Cir.2001), *cert. denied,* 535 U.S. 1077, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002) (*Eastern Minerals*); 30 U.S.C. §§ 1256, 1272. In 1980 and 1981, Eastern Minerals obtained two separate one-year permits from the State of Tennessee that authorized Eastern Minerals to prepare approximately 33 acres on the Sewanee coal seam on the Cane property for a box cut for future coal mining operations. *See Wyatt,* 271 F.3d at 1093–94. Eastern Minerals then expended $3.8 million to develop the box cut and prepare for mining operations on the Sewanee seam. *See*

Pls.' Facts ¶ 14. *See also Wyatt*, 271 F.3d at 1093–94.

Eastern Minerals' subsequent application to renew its mining permit was denied in 1984. *Wyatt*, 271 F.3d at 1094. Eastern Minerals continued unsuccessfully to pursue a permit until 1994. *Id.* at 1094–95. The United States Department of Interior, Office of Surface Mining (OSM), continuously considered Eastern Minerals' mining permit application until it rendered a final decision on the merits of the application in 1994. *Id.* at 1095. Eastern Minerals, however, had no property interest in 1994 because its lease with Cane had terminated on February 28, 1991. *Id.* at 1097. It is nowhere suggested in the record that Cane pursued a mining permit application independently of Eastern Minerals before or after February 28, 1991. Accordingly, there was no valid mining permit application before OSM after February 28, 1991. The Federal Circuit found no compensable taking prior to February 28, 1991. *Id.*

In 1995, OSM accepted and undertook consideration of a petition by Save Our Cumberland Mountains (SOCM), a concerned citizens group, to designate land encompassing and adjacent to plaintiffs' property as unsuitable for surface coal mining operations. 2000 Compl. ¶ 30; Pls.' Exh. 2 at 10. On June 17, 2000, the Secretary issued a letter of decision designating most of the petition area unsuitable for surface coal mining. 2000 Compl. ¶ 37. Cane and Colten then filed their 2000 complaint in this court. *See* 2000 Compl. In 2002, the Wyatts and the Wyatt Trusts also brought a takings claim arising out of the Unsuitability Determination. *See* 2002 Compl.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The fact that this is a takings case "does not affect the availability of summary judgment when appropriate to the circumstances." *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996).

### B. The Relevant Parcel

The first issue in any takings analysis is to determine the specific parcel involved. *See, e.g., Appolo Fuels, Inc. v. United States*, 54 Fed.Cl. 717, 723 (2002). The relevant parcel becomes the denominator in the fraction that is used to show the economic impact of the government action. *See, e.g., Cane II*, 54 Fed.Cl. at 105 (discussing the mechanics of the takings calculation). While the Supreme Court has never articulated a rigid formula to determine the relevant parcel, it has consistently used the "parcel as a whole rule." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 327, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

Plaintiffs argue on Cane's behalf that the Rainey Ridge and Main Tracts should be treated separately because they are not contiguous, and therefore cannot be viewed as being within the same "parcel" under the "parcel as a whole" test.[6] Pls.' Cross–Motion at 27–30. According to plaintiffs, Cane's ownership is "the only common factor between the Main Tract and the Rainey Ridge Tract." Id. at 29. Plaintiffs argue that Cane never treated the tracts as a single unit, that they are remote from one another, and that the mining permits that were sought and obtained "focused on opening the Sewanee seam coal on the Main Tract for mining." Id. at 28–29. "[B]ecause the Main Tract and the Rainey Ridge Tract are physically separate from each other, subject to different mining arrangements, and partially owned by different claimants,"[7] plaintiffs argue, the tracts should be subject to separate takings calculations. Id. at 30.

Defendant counters that the court decided the relevant parcel issue in its earlier opinion, and therefore should not revisit it now. Defendant's Opposition to the Plaintiffs' Cross–Motion for Summary Judgment and Reply Brief in Support of its Motion for Summary Judgment as to the Claims of Plaintiffs Cane and Colten (Def.'s Reply) at 4–6. According to defendant, "[p]laintiffs received their one good bite of the apple and offer no reason why they should be given a second bite." Id. at 6. Of course, defendant's argument does not apply to the Wyatts and the Wyatt Trusts, who were not involved in the Cane II briefing.

The issue before the court in Cane II was whether, as to Cane, plaintiff's fee simple interest or the mineral interest included within their fee simple estate was the relevant parcel. Cane II, 54 Fed.Cl. at 103. The court found that the relevant parcel as to Cane was Cane's fee simple interest, not just the included mineral interest that plain-

tiffs had claimed to be the parcel taken. See id. at 112. The issue before the court now is whether Cane's property can be divided into separate parcels because the land conveyed to Cane included several different tracts. See Pls.' Cross–Motion at 27–30.

While defendant's argument that plaintiffs have, in effect, waived the multiple tract issue by failing to brief it in connection with their prior motion has some force, the court nevertheless addresses here whether the Main Tract and Rainey Ridge Tract are separate parcels or part of the "parcel as a whole" for takings analysis.

■ In determining the "parcel as a whole," the focus is on the economic expectations of the claimant with regard to the property. Forest Props., Inc. v. United States, 177 F.3d 1360, 1365 (Fed.Cir.1999), cert. denied 528 U.S. 951, 120 S.Ct. 373, 145 L.Ed.2d 291 (1999) (citing Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 500–01, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)). Accordingly, where a "developer treats legally separate parcels as a single economic unit, together they may constitute the relevant parcel." Id. (citing Keystone, 480 U.S. at 500–01, 107 S.Ct. 1232; Naegele Outdoor Adver. v. City of Durham, 844 F.2d 172, 176 (4th Cir.1988)). This is a factual inquiry, and the relevant considerations have been said to include

> the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the [regulated] lands enhance the value of remaining lands, and no doubt many others . . . .

Ciampitti v. United States, 22 Cl.Ct. 310, 318 (1991).

■ While plaintiffs now argue various distinctions among the parcels included in the Cane property, Pls.' Cross–Motion at 27–30, the evidence shows that Cane treated all

---

6. Cane focuses on the Main Tract and Rainey Ridge Tract because the claims of Cane, the Wyatts, and the Wyatt Trusts concern only these two tracts. Pls.' Cross–Motion at 29–30.

7. Plaintiffs argue, as a factor in support of their separate parcel argument, that the reserved mineral royalty interests in the tracts are owned by separate parties: the Wyatts as individuals in the

Main Tract, and the Wyatt Trusts in the Rainey Ridge Tract. Pls.' Cross–Motion at 29. Plaintiffs cite no authority for this argument and the court believes that the diversity of ownership of the reserved mineral royalty interests is irrelevant to the determination of the relevant parcel for Cane's claim.

the tracts it purchased as one entity. *See id.* at 28–29. The pre-investment marketing and research did not differentiate the different tracts. Pls.' Exh. 6. The Cane property was presented as a single investment opportunity. Pls.' Exh. 7. While plaintiffs argue that there were separate transactions for the separate tracts here, Transcript of Oral Argument held on March 25, 2003(Tr.) at 76–77, the court does not find this argument persuasive or supported in the record. The recommendation made in the Cane Behre Dolbear report refers to a bundle of tracts to be purchased for $5 million. Pls.' Exh. 6 at 85.[8] There is no indication of any consideration of separate financing for the different tracts, and there are no plans or proposals to develop the separate tracts independently of each other. When the Cane purchase was completed, all tracts were transferred to Cane on the same deed. Pls.' Exh. 10. And, importantly, the deed did not state separate consideration for the various tracts. *Id.*

The court in *Ciampitti* found that non-contiguous tracts were part of the same "parcel as whole" because "the most persuasive consideration that [plaintiff] treated all of Purchase 7, which encompasses virtually all the lots at issue, as a single parcel for purchase and financing ... [makes it] inappropriate to allow him now to sever the connection he forged when it assists in making a legal argument." *Ciampitti*, 22 Cl.Ct. at 320. Likewise, the court finds that it would be inappropriate here to sever the two tracts to facilitate plaintiffs' takings arguments when Cane bought all of its tracts as a single property and has treated them as a single investment for the past 24 years. Therefore, plaintiffs' Cross–Motion for Partial Summary Judgment that the Main Tract and Rainey Ridge Tract Constitute Different "Parcels"

and are the Only Parcels Relevant to their Claims is DENIED.[9]

C. Takings Analysis

1. The Cane Property

In its October 2, 2002 opinion, the court found that *Penn Central* provided the proper framework within which to analyze the alleged taking of Cane's property. *Cane II*, 54 Fed.Cl. at 108. *Penn Central* sets out a three-part test to guide the "ad hoc, factual inquiries" that are used to determine if a taking has occurred. 438 U.S. at 124, 98 S.Ct. 2646. "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations.... So, too, is the character of the governmental action." *Id.* (internal citations omitted). In the years since *Penn Central,* the Court has cautioned not to give any one factor "exclusive significance in the *Penn Central* analysis." *Palazzolo v. Rhode Island,* 533 U.S. 606, 635, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (O'Connor, J., concurring). The Court recently reaffirmed that *Penn Central* establishes the legal framework for regulatory takings cases:

> Our polestar ... remains the principles set forth in Penn Central itself and our other cases that govern partial regulatory takings. Under these cases, interference with investment-backed expectations is one of a number of factors that a court must examine..... Penn Central does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required..... The temptation to adopt what amount to per se rules in either direction must be resisted.

---

**8.** "The purchase of the subject property for a price of $5 million appears justified and should be undertaken." Pls.' Exh. 6 at 85. The property was defined as consisting of "one large tract of about 8,000 acres and four nearly contiguous tracts each of about 500 acres." *Id.* at 73.

**9.** While plaintiffs sought to decide the relevant parcel issue for Cane, the Wyatts, and the Wyatt Trusts, the court denies the motion with prejudice only as to Cane. The court's decision is based on Cane's treatment of the property during

and after the sale from the Senior Wyatts. The Wyatts and the Wyatt Trusts acquired their mineral royalty interest differently, may treat their individual interests differently, and may have different plans for their property interests. As these and other potentially relevant issues have not been addressed in this round of summary judgment briefing, the court declines to decide the relevant parcel as to the Wyatts and the Wyatt Trusts until the factual record can be more fully developed.

The Takings Clause requires careful examination and weighing of all the relevant circumstances in this context.

*Tahoe–Sierra*, 535 U.S. at 327 n. 23, 122 S.Ct. 1465 (quoting *Palazzolo*, 533 U.S. at 633–36, 121 S.Ct. 2448 (O'Connor, J., concurring)) (internal citations omitted).

### a. Economic Impact of the Regulation

Defendant argues that "the test for assessing the economic impact of a regulatory action is perhaps the most settled aspect of the *Penn Central* analysis." Def.'s Reply at 7. This court has stated that in conducting this analysis it "must 'compare the value that has been taken from the property with the value that remains in the property.'" *Walcek v. United States*, 49 Fed.Cl. 248, 258 (2001), *aff'd* 303 F.3d 1349 (Fed.Cir.2002) (quoting *Keystone*, 480 U.S. at 497, 107 S.Ct. 1232). Defendant argues that "[t]he use of fair market value ensures that just compensation will be measured by objective means." Def.'s Reply at 7 (citing *United States v. 50 Acres of Land*, 469 U.S. 24, 35, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984)).

Plaintiffs argue that the test for determining the economic impact of the regulation was best articulated in *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560 (Fed.Cir. 1994). Pls.' Cross–Motion at 43. There, the court states that "'[i]n determining the severity of the economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored.'" *Florida Rock*, 18 F.3d at 1567 (quoting *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893 (Fed.Cir.1986), *cert. denied* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987)).

■ The court agrees with defendant that "recoupment" is not the required measure of economic impact. The court agrees with plaintiffs that recoupment can sometimes be relevant. For example, if a party were able to recoup its investment after the government action, it is less likely that a taking has occurred. *See Walcek v. United States*, 303

F.3d 1349, 1357 (Fed.Cir.2002). Utilizing recoupment in the way that plaintiffs suggest would reward parties who make bad investments, however. If a party overpaid for a piece of property, it could reap an economic windfall if the economic impact of later governmental action is measured as the party's inability recoup its investment or earn a positive return. Yet that is essentially what plaintiffs are seeking here. The court believes that the proper measure of economic impact is a comparison of the market value of the property immediately before the governmental action with the market value of that same property immediately after the action. *See Keystone*, 480 U.S. at 497, 107 S.Ct. 1232.

■ Assuming that "recoupment" is not the proper measure of economic impact, plaintiffs contend that "[a] reasonably accurate assessment of the 'proportional' or 'percentage' measure is not possible at this time because evidence of valuation is incomplete and disputed between the parties." Pls.' Cross–Motion at 45. Even though the government uses plaintiffs' own expert's valuation figures to determine its percentage, plaintiffs argue that "the government's approach to the denominator is seriously flawed as a factual matter." *Id.*[10] In its valuation determination, defendant employs as the numerator the coal value (what plaintiffs lost) and, as the denominator, the fair market value of the property just before the taking, measured as the coal value plus the timber value. Def.'s MSJ at 37–38. Defendant's calculation yields a 49.6% diminution of value as a result of the government action. *Id.* at 38. Plaintiffs argue that this valuation did not take into account disputed issues of fact regarding the timber value of Cane's land. Pls.' Cross–Motion at 45–47. Plaintiffs allege that most of these disputes occur because "[o]rdinarily, a timber investment is valued on a discounted cash-flow basis over a projected timeline of years required to bring growing timber to harvest." *Id.* at 47 (citation omitted). Plaintiffs argue that when its expert used this method of timber valuation,

---

**10.** This "flaw" is based, plaintiffs argue, on defendant's failure to separate out the separate tracts in determining the impact of the regulation. *See* Pls.' Cross–Motion at 45–46. As noted above, the court does not believe the tracts should be so separated. The court has found instead that the "parcel as a whole" is the entire Cane property. *See supra* section II.B.

it resulted in a value of minus $243,240. *Id.* (citing Pls.' Exh. 59 at 1494–95).

This negative timber valuation is the subject of a motion to strike by defendant. In an expert report dated January 18, 2002, and produced within the time permitted by the court's order of November 21, 2001, plaintiffs' timber expert, Michael Black, valued timber on the Cane property at $3,944,313. Pls.' Exh. 43 at 996. In a subsequent declaration dated January 28, 2003, Mr. Black changed this valuation based on "events that have occurred since the January 2002 Report and my June 2002 Declaration." Pls.' Exh. 59 ¶ 1.

Defendant argues that, because Mr. Black used a new methodology to value the timber in his second declaration, this is a new expert report. Defendant's Motion to Strike the Second Declaration of Michael Black and the Forthcoming Supplemental Expert Report of James W. Boyd (Def.'s Strike or defendant's motion to strike) at 5. Therefore, defendant argues that this declaration falls within RCFC 26(a)(2). *Id.* Rule 26(a)(2) states that disclosures of expert reports are to be made "at the time and in the sequence directed by the court." RCFC 26(a)(2)(C). This declaration was produced over a year after plaintiffs' January 18, 2002 deadline for production of its expert timber report, and after the close of discovery in this case. *Id.* at 6 (citing Court's Order of Nov. 21, 2001). Defendant argues that this late production of the expert report "is the functional equivalent of producing new expert testimony in the middle of trial." *Id.* Defendant claims this is extremely prejudicial to it, and accordingly Mr. Black's declaration should be stricken. *Id.* at 7.

Plaintiffs contend that Mr. Black's expert opinions have not changed from his earlier declaration and report. Plaintiffs' Opposition to Defendant's Motion to Strike the Second Declaration of Michael Black and the February 2003 Report of James W. Boyd (Pls.' Strike Opp.) at 2. Plaintiffs contend that Mr. Black's first declaration noted that his earlier report " 'd[id] not take into account an own-

er's costs of a timber sale, and those costs to Cane in this salvage-cutting operation are relatively large.' " *Id.* at 6 (quoting Pls.' Exh. 45 ¶ 8). According to plaintiffs, Mr. Black's initial report was simply an estimate, and his later declarations more accurately represent the value of timber on Cane's property. *Id.* at 14–15. Further, Mr. Black's second declaration "is derived from an additional six months' experience with the salvage timber harvest." *Id.* at 7. Plaintiff argues that "[t]he Second Black Declaration was submitted in accord with the governing procedural rule, RCFC 26(e)(1), which requires the supplementation of disclosures to address 'additional . . . information [t]hat has not otherwise been made known to the other party during the discovery process or in writing.' " *Id.* at 2. Plaintiffs argue that this rule is designed to prevent surprises at trial by requiring parties to provide a " 'full and accurate understanding of the true facts' " to the other side. *Id.* at 10 (quoting Moore's Federal Practice, § 26.02 (Daniel R. Coquillette, et al., eds., 3d ed.1997)). Thus, "supplementation is made 'at appropriate intervals' as information becomes available." *Id.* at 11 (citing RCFC 26(e)(1)). Plaintiffs argue that its purpose was to provide more accurate information to defendant as that information became available. *See id.* at 9.

The court does not find plaintiffs' arguments compelling. As an initial matter, it is far from clear that the new timber valuation is relevant. Economic impact for a takings analysis is determined by comparing the market value of the property at a moment in time just before the government action with the market value just after the government action. *Keystone,* 480 U.S. at 497, 107 S.Ct. 1232. The difference between these two figures is the compensation to which a plaintiff may be entitled. *See id.* Events that occurred well after the June 2000 date when the taking allegedly occurred do not appear to be relevant to the market value of the timber on that date. Further, the court finds unpersuasive plaintiffs' argument, Pls.' Strike Opp. at 20,[11] that a drop in value from well over $3 million to a negative $223,280

---

11. "Mr. Black's Second Declaration is fully consistent with his prior submissions—his report of January 2002, his deposition of February 2002, and his First Declaration of June 2002." Pls.' Strike Opp. at 20.

does not reflect a substantial change that could be viewed as prejudicial. It was only after the court's opinion in *Cane II*, according weight to the value of timber of Cane's property, *Cane II*, 54 Fed.Cl. at 107–08, that the second declaration of Michael Black appeared. Indeed, the second declaration was even filed after defendant filed its Motion for Summary Judgment now before the court, utililizing Mr. Black's first report. *See* Def.'s MSJ at 37. For the foregoing reasons, the court GRANTS defendant's Motion to Strike the Second Declaration of Michael Black.

Because the second timber valuation has been stricken, the court uses the first timber valuation prepared by plaintiffs' expert in determining the economic impact of the regulation. Using plaintiffs' own expert, the result is a diminution of 49.6% of the value of plaintiffs' property in this case. Def.'s MSJ at 38.[12] *See Fabil Mfg. Co. v. United States*, 237 F.3d 1335, 1337 (Fed.Cir.2001) (viewing evidence in favor of the non-moving party means the court must credit its evidence for purposes of deciding a summary judgment motion). As defendant notes, the Supreme Court has denied takings claims where the diminution was comparable or greater. Def.'s MSJ at 38. There is not, however, "an automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value." *Yancey v. United States*, 915 F.2d 1534, 1541 (Fed.Cir.1990) (finding taking in the case of a 77% diminution, 915 F.2d at 1539). At a minimum, a plaintiff must show "serious financial loss" for there to be a taking. *Cienega Gardens v. United States*, 331 F.3d 1319, 1341 (Fed.Cir.2003). A single factor may not be dispositive, however, and must be weighed with the other two *Penn Central* factors. *Palazzolo*, 533 U.S. at 635–36, 121 S.Ct. 2448 (O'Connor, J., concurring).

b.  Interference with Investment–Backed Expectations

Defendant argues that Cane knew of the risks associated with purchasing land subject to the SMCRA, and therefore its investment-backed expectations are minimal. Def.'s MSJ at 29–36. Defendant notes that SMCRA was passed two years before the Cane purchase, and in both the Citibank brochures and the Behre Dolbear reports the existence of the regulatory framework was clearly noted. *Id.* at 31–32. Defendant also argues that the known volatility and riskiness of the coal market should be taken into account, as should the problems associated with finding a qualified manager for the property and the economic drag of the Wyatts' and Wyatt Trusts' reserved 3.5% mineral royalty interest. *Id.* at 32–33. All these problems lead defendant to conclude that "any expectations Cane may have had were tenuous at best and could not be considered 'reasonable.'" *Id.* at 33.

Plaintiffs argue that defendant is seeking the application of the notice rule that was rejected by the Court in *Palazzolo*. Pls.' Cross–Motion at 40–41. According to plaintiffs, the notice rule "barred takings claims based on a regulatory regime where property was acquired after that regime was put in place." *Id.* Plaintiffs also quote extensively from the Cane Behre Dolbear report to argue that Cane had "a very reasonable basis for its expectation that coal mining would be permitted under SMCRA." *Id.* at 42.

Defendant counters that its "expectations analysis is fully consistent with *Palazzolo*." Def.'s Reply at 20. To support this contention, defendant relies primarily on *Rith Energy, Inc. v. United States*, 270 F.3d 1347

---

12.  This valuation is based on an expert report filed by James W. Boyd in September of 2001. Mr. Boyd filed a subsequent report in February of 2003, also addressed in defendant's motion to strike. *See* Defendant's Reply in Support of its Motion to Strike the Second Declaration of Michael Black and the Further Supplemental Expert Report of James W. Boyd (Def.'s Strike Reply) at 8. Plaintiffs claim that this report was necessary to value the Wyatts' interest in the property at issue, and any attempt to strike the report is denying the Wyatts their right to expert

testimony in this case. Pls.' Strike Opp. at 22. The court disagrees. The court is only reviewing economic data at this juncture for the purpose of assessing Cane's and Colten's takings claims. The Wyatts' and Wyatt Trusts' takings claims are not before the court in the pending motions. For the same reasons stated in granting the motion to strike the second declaration of Michael Black, the court also GRANTS defendant's motion to strike the February 2003 Report of James W. Boyd.

(Fed.Cir.2001). In *Rith,* plaintiff argued that "it was 'entitled to stand in the shoes of its predecessors who owned before SMCRA,'" and therefore it had reasonable investment-backed expectations despite the regulatory regime in place when it bought its property. *Rith,* 270 F.3d at 1350. The court in *Rith* noted that while the Supreme Court in *Palazzolo* rejected an absolute notice rule, it did not find that the court can never take the regulatory regime into account in determining a party's investment-backed expectations. *Id.* The *Rith* court quoted Justice O'Connor's concurring opinion in *Palazzolo:*

> Today's holding does not mean that the timing of the regulation's enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis. Indeed, it would be just as much error to expunge this consideration from the takings inquiry as it would be to accord it exclusive significance.... Interference with investment-backed expectations is one of a number of factors that a court must examine. Further, the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations.

*Id.* (quoting *Palazzolo,* 533 U.S. at 633, 121 S.Ct. 2448). The court in *Rith* further stated that where a plaintiff is involved in a highly regulated industry-mining, as is plaintiff here-"the plaintiff's reasonable investment-backed expectations are an especially important consideration in the takings calculus." *Id.* at 1351. As the Federal Circuit observed, "A party in Rith's position necessarily understands that it can expect the regulatory regime to impose some restraints on its right to mine coal under a coal lease." *Id.*

In addition, this court has recently addressed the issue of the impact of SMCRA on a party's reasonable investment-backed expectations in *Appolo Fuels.* In *Appolo Fuels,* as here, plaintiff's land was subject to a section 1272 petition under SMCRA. 54 Fed.Cl. at 733. In *Appolo Fuels,* plaintiff had a long history of negotiating SMCRA permits, and several of the leases of its land specifically mentioned a pending petition covering that property. *Id.* at 733–34. The court in *Appolo Fuels* stated:

[Plaintiff] cannot deny that the temporal relationship between the enactment of SMCRA and the time it purchased the parcel at issue gave it notice that it was subject to regulation. "The investment-based expectation criterion 'limits recovery to owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation. One who buys with knowledge of a restraint assumes the risk of economic loss.'" *Forest Properties,* 41[177] F.3d at 1367 (quoting *Creppel v. United States,* 41 F.3d 627, 632 (Fed.Cir.1994)). Plaintiff, with its acknowledged long history in negotiating SMCRA permits, cannot claim now that it had a reasonable expectation that its land would remain unfettered by regulatory imposition.

54 Fed.Cl. at 734.

This case is slightly different from *Rith* and *Appolo* in that plaintiffs Cane and Colten are owned by an investor with no coal mining experience. The investor at issue had no experience negotiating SMCRA leases, and there was no mention of citizen petitions in any of the leases transferring property to Cane or Colten. Therefore, the court does not believe that the mere existence of the regulatory regime would put parties of plaintiffs' sophistication on actual notice that they were at risk of economic loss from an unsuitability petition.

The relationship between the actual expectations of a takings plaintiff and the reasonableness of those expectations has recently been addressed by the Federal Circuit. *Cienega Gardens,* 331 F.3d 1319. In *Cienega Gardens,* the court determined that the takings plaintiffs' expectations "would not really be investment-backed unless they actually believed in a certain outcome and entered the program in reliance on it." *Id.* at 1346. The "first step" is an analysis of plaintiff's actual expectations "because [the court] require[s] actual expectation of, or reliance on the government not nullifying [plaintiff's] contractual and regulatory rights as a threshold matter." *Id.* If a plaintiff has an actual "expectation of, or reliance on" government action or inaction, as claimed by plaintiffs here, the court's focus turns to the

reasonableness of those expectations. *Id.* at 1346.

As plaintiffs point out, the Cane Behre Dolbear report stated, among other things, that "[t]here is no reason to believe that the necessary permits will not be granted." Pls.' Cross–Motion at 42 (quoting Pls.' Exh. 6 at 102). Further, plaintiffs argue that "Citibank's advisors specifically and carefully examined whether permitting under SMCRA would pose substantial problems and concluded that it would not." *Id.* at 41. Plaintiffs then conclude that "Cane's reasonable expectations were shaped in light of a full consideration of SMCRA." *Id.*

However, plaintiffs' conclusion is not supported by the record. In addition to the optimistic assessment of the permit process in the Cane Behre Dolbear report, Pls.' Exh. 6 at 102, Cane was specifically advised in the Cane Citibank brochure that "required permits may not be attainable." Pls.' Exh. 7 at 143. Moreover, plaintiffs' 2000 Complaint is not about permitting under SMCRA. It is about the Unsuitability Determination, a subject about which plaintiff appears to have been ignorant.[13] The record does show that plaintiffs were aware of the permitting process under SMCRA. While they should have been aware of the potential for the petition process that occurred here, they do not appear to have taken it into account. While plaintiffs points to the fact that they "paid full-market price for the coal lands" as evidence that the regulation did not have any adverse effect on their investment-backed expectations, Pls.' Cross–Motion at 42 n. 32, that payment could serve equally well as evidence of an improvident investment. The Federal Circuit has found that such an investment can occur. *Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1363 (Fed.Cir.2000) ("[T]he loss is the result of an error in market judgment, not a result of the restriction as such. In the parlance of takings law, the purchaser does not have reasonable expectations that the property can be used for the prohibited purpose; to assess the government for such a loss is to give the

purchaser a windfall to which she is not entitled.").

The issue is whether Cane could have *reasonable* investment-backed expectations, that is, whether a reasonable investor in Cane's circumstances would believe that the regulatory framework would not prohibit mining on its property. *See Cienega Gardens,* 331 F.3d at 1348. The statutory language clearly discusses permits, 30 U.S.C. § 1256, and the petition process, 30 U.S.C. § 1272. A reasonably prudent individual investing $5 million would, in the court's view, become acquainted with all of these regulations, as well as the possible impact of the adjacency of a major state park. Cane did not do so in this case. Because a reasonably prudent investor could not have believed that its investment was without regulatory risk, Cane cannot now claim that it had reasonable investment-backed expectations that were unexpectedly impacted by government action.

### c. Character of the Governmental Action

Defendant argues that the governmental action here "is a traditional exercise of police power to protect public safety, health and welfare from the 'unacceptable risks' that coal mining operations on Cane's property would pose." Def.'s MSJ at 40–41. Defendant points to the Secretary's decision that designated the land at issue as being unsuitable for surface coal mining operations because "such activities would (1) affect the fragile lands of the Park and certain other fragile lands in the petition area, and (2) be incompatible with State or local land use plans and programs." *Id.* at 40 (citing Pls.' Exh. 3). Defendant argues that this fits well within the test articulated in *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1176 (Fed.Cir.1994) that involves "a balancing of the plaintiff's interest against the Government's need to protect the public." *Id.* at 39.

Plaintiffs argue that any attempt to place this government action within the traditional police powers category is misplaced. *See* Pls.' Cross–Motion at 39. Plaintiffs argue that the Secretary's determination was made

---

13. In reviewing the Cane Behre Dolbear report, the court was unable to find any mention of the unsuitability petition process established by 30

U.S.C. § 1272. *See* Pls.' Exh. 6. Nor was the court able to find any mention of this process in the Cane Citibank brochure. *See* Pls.' Exh. 7.

for aesthetic, not safety reasons. *Id.* Further, plaintiffs argue that since nothing in the statutory or regulatory framework *compelled* the Secretary's Unsuitability Determination, plaintiffs should not be forced to bear the cost of the decision alone. *Id.* at 40.

The court does not believe that the Secretary decided that plaintiffs' land was unsuitable for surface mining for purely aesthetic reasons. It is clear that the Secretary was concerned about the aesthetics of the park and the effect on those values that coal mining would have. Pls.' Exh. 3 at 22. The Secretary also addressed a concern about the impact coal mining would have on historic lands within the designated area. Pls.' Exh. 3 at 27. And the Secretary was concerned with how coal mining would affect fragile lands, the heightened risk of natural hazards such as flooding if coal mining were permitted, and the incompatibility of coal mining with the mission of Fall Creek Falls State Park. Pls.' Exh. 3 at 23–27, 30, 32.

These concerns fall squarely within the ambit of SMCRA. In passing this legislation, Congress found that:

> [M]any surface mining operations result in disturbances of surface areas that burden and adversely affect commerce and the public welfare by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural, and forestry purposes by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, by creating hazards dangerous to life and property[,] by degrading the quality of life in local communities, and by counteracting governmental programs and efforts to conserve soil, water, and other natural resources[.]

30 U.S.C. § 1201(c). To address these concerns, Congress passed legislation in 1977 that "establish[ed] a nationwide program to protect society and the environment from the adverse effects of surface mining opera-

tions." 30 U.S.C. § 1202(a). Congress endeavored to "strike a balance between the protection of the environment ... and the Nation's need for coal as an essential source of energy," as well as to "assure that appropriate procedures are provided for the public participation in the development, revision, and enforcement of regulations, standards, reclamation plans or programs established by the Secretary ...." 30 U.S.C. §§ 1202(f), (i).

The question remains, however, whether "the burden for remedying a societal problem has been imposed on all of society." *Cienega Gardens,* 331 F.3d at 1340. As the Court of Appeals for the Federal Circuit has stated, "The disproportionate imposition on the Owners of the public's burden ... is not rendered any more acceptable by worthiness of purpose." *Id.* The worthiness of government's purpose of protecting the environment is not in dispute. It is not within Congress' power to promote this purpose without also providing compensation if the regulation to achieve the goal, as to a particular plaintiff, "goes too far." *Penn. Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

The portion of SMCRA involved here, the unsuitability designation process, impacts broadly all of those who are mining or could mine by surface methods. 30 U.S.C. § 1272. Some of the reasons for determining unsuitability may fairly be characterized as necessary to forestall or abate a nuisance ("landslides ... pollut[ion of] the water ... creati[on] of hazards dangerous to life and property"), 30 U.S.C. § 1201(c), but these would not in any case be within the rights of a property owner. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Rith,* 247 F.3d at 1362. Other reasons, including several of the Secretary's concerns here, are not within the ambit of traditional nuisance law or within the reach of traditional police powers. In contrast to the law addressed in *Cienega Gardens,*[14]

14. *Cienega Gardens* involved the Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100–242, tit. II, 101 Stat. 1877 (1998) (codified at 12 U.S.C. § 1715*l*(1988)) and

the Low–Income Housing Preservation and Resident Homeownership Act of 1990, Pub.L. No. 101–625, tit. VI, 104 Stat. 4249 (1990) (codified at 12 U.S.C. §§ 4101–4147 (1994)). *Cienega Gar-*

however, the designation portion of SMCRA does not appear drawn in a way that unnecessarily targets a small group to bear the burden of the regulatory regime. It is difficult to imagine how Congress could preserve the values of this country's major state and federal parks without addressing to some degree the adjacent activities that could adversely impact water quality, erosion, viewlines, and other relevant matters. In this case, the character of the government action considered by itself neither requires nor forecloses a finding of a taking.

### d. Weighing of the Three *Penn Central* Factors

The court now weighs a 49.6% diminution of value, little or no interference with reasonable investment-backed expectations, and a government action that, in the absence of other considerations, neither forecloses nor requires a finding of a taking. The character of the government action could, in conjunction with other factors, support a taking, but this single factor does not support a taking in the absence of reasonable investment-backed expectations and where the economic diminution does not reach a level that has been associated with a finding of a taking. *See, e.g., Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (46% diminution did not require a taking). *See*

*dens,* 331 F.3d at 1320. The Federal Circuit found this legislation was unfairly targeted at plaintiffs because while the legislation could have imposed the cost of providing low-income housing on a broader segment of society, the government instead chose to place the burden on those landlords who were already providing such housing but planned to exercise their contractual right to prepay loans and exit the program. *See id.* at 1320, 1339.

**15.** In a recent filing, the parties state that two recent Federal Circuit Cases, *Cienega Gardens* and *Chancellor Manor v. United States,* 331 F.3d 891 (Fed.Cir.2003), "opine[] on the sufficiency of the record to proceed with summary judgment." Joint Notice of Citation of Supplemental Authorities at 1. While the court agrees that these two cases address the level of evidence necessary to grant a summary judgment motion, it does not believe they impact the resolution reached here. The court in *Cienega Gardens* found that specific findings of fact were necessary for the court to find, on summary judgment, that under the *Penn*

*also Cienega Gardens,* 331 F.3d at 1341 (requiring a "serious financial loss" to support a taking, weighed with other factors). Based on the three *Penn Central* factors, the court finds that there was no taking in this case. Therefore, the court GRANTS defendant's Motion for Summary Judgment as to the takings claim of Cane.[15]

### 2. The Colten Property

### a. Selection of the Legal Framework for Analysis

In its October, 2002 opinion, based on the record then before it, the court left open the question of whether there remained any economically viable use of Colten's land after the Secretary's Unsuitability Determination in 2000. *Cane II,* 54 Fed.Cl. at 109. If, after the government's action, there is no economically viable use of the land, then the per se takings rule of *Lucas* governs. *See Lucas,* 505 U.S. at 1027, 112 S.Ct. 2886. If the regulation results in a partial diminution of value, then the *Penn Central* framework forms the basis for analysis. This determination turns on the economic impact of the regulation, which in this case depends on a determination of the scope of the governmental action.

Plaintiffs argue that the Unsuitability Determination prevents mining on the entire Little Mountain tract.[16] Pls.' Cross-Motion

*Central* test summary judgment is appropriate. *See Cienega Gardens,* 331 F.3d at 1340–41. Based on the record before it, the court has been able to identify sufficient material facts that are not in dispute upon which it has relied in deciding that summary judgment is appropriate. RCFC 56(c). The parties have filed 2428 pages of documents as exhibits (894 pages by defendant, 1564 pages by plaintiffs), as well as two rounds of proposed findings of uncontroverted facts. The court believes that the record before it provides ample evidence, including relevant portions not in dispute, on which the court can base its decision.

**16.** The court believes that, for the same reasons stated with respect to Cane's property in section II.B., the "parcel as a whole" includes all the tracts listed on the deed transferring ownership of the property to Colten. *See* Pls.' Exh. 18. However, defendant has not taken the opportunity to argue that the value of the other tracts should be taken into account, focusing instead on the Little Mountain tract. Def.'s Reply at 17.

at 54. This argument rests on the contention that either the Secretary's Unsuitability Determination prevents mining, or that, as a practical matter, the Knoxville office of OSM would not permit surface mining because of the opposition it would generate from the same citizen groups that filed the unsuitability petition. *Id.* at 54 and n. 38.

Defendant counters that the Secretary's Unsuitability Determination only preludes surface coal mining within the designated area; the "viewshed"[17] is not included in that area, and therefore it cannot be viewed as being taken by the Secretary's decision. Def.'s Reply at 18. Defendant further contends that any argument that OSM would not permit mining in the viewshed is not ripe because Colten has never applied for a permit to mine this area. *Id.* at 19. Defendant also points out that the requirement to obtain a permit in and of itself has never been viewed as being a taking. *Id.* at 18–19 (quoting *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–27, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985)).

The court agrees with defendant that the Secretary's Unsuitability Determination prohibits mining only in the designated area and could not effect a taking of the "viewshed" portion of the *Little Mountain Tract*. SOCM in its petition asked OSM "to designate the watershed *and viewshed* of Fall Creek Falls State Park and Natural Area in Van Buren and Bledsoe Counties, Tennessee, as unsuitable for surface coal mining." Pls.' Exh. 2 at 10 (emphasis added). In his decision, the Secretary designated only the watershed in Fall Creek Falls State Park and Natural Area as unsuitable for surface coal mining. Pls.' Exh. 3 at 11. The Secretary explicitly rejected the argument that the viewshed was unsuitable. Because the scope of the Secretary's decision is clearly delineated in his letter of decision, the court cannot now find that the Unsuitability Determination somehow prohibits mining in the viewshed area.

Further, the court agrees with defendant that any issue involving what OSM may do in the future in regard to permit applications for mining in the viewshed is not ripe for resolution at this time. This court has previously decided that a takings claim of Colten's lessee was not ripe because it never applied for a permit to mine under SMCRA. *Eastern Minerals*, 36 Fed.Cl. at 547–48; *see also Cane I*, 44 Fed.Cl. at 790 (finding Colten's permit claim unripe). Plaintiff cannot argue that it would be futile to apply for a permit to mine the undesignated area. The futility exception generally requires that a permit be denied before it applies. *See S. Pacific Transp. Co. v. Los Angeles*, 922 F.2d 498, 504 (9th Cir.1990), *cert. denied*, 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991).

Because there is still land in the Little Mountain Tract with coal deposits that are potentially mineable, Colten's property retains some economic value. *See* Pls. Exh. 40 at 944; Def.'s Exh. 55 at 690. Because "[a]nything less than a 'complete elimination of value,' or a 'total loss' ... would require the kind of analysis applied in *Penn Central*," the court will utilize that framework to determine if a taking has occurred. *Tahoe–Sierra*, 535 U.S. at 330, 122 S.Ct. 1465 (quoting *Lucas*, 505 U.S. at 1019–20 n. 8, 112 S.Ct. 2886).

b. *Penn Central* Analysis

■ Under the *Penn Central* framework, the court notes that the parties' arguments on the character of the government action are substantially identical to those arguments made with respect to Cane. Pls.' Cross–Motion at 52; Def.'s MSJ at 48. The court similarly concludes that the character of the government action here by itself neither requires nor forecloses the finding of a taking. Much of the analysis regarding investment-backed expectations is also the same, but there are several differences with respect to

---

Because defendant does not argue the point, and because this issue does not affect the court's resolution of the dispute, the court will confine its analysis to the Little Mountain tract.

17. Plaintiffs contend that the "viewshed" includes all areas that can be seen from within the National Park. Pls.' Cross–Motion at 54. Colten claims that since "any mountain top surface mine 'behind' [the Little Mountain ridgeline] would be visible from some places within the Park," the entire Little Mountain tract is constructively in the "viewshed." *Id.* at 54.

the Colten property, none of which favors Colten's position. Defendant argues that the Behre Dolbear report prepared for Colten's investment emphasized the large degree to which Colten's success depended on Cane. Def.'s MSJ at 47. Defendant also points to the "modest rate of return" that was anticipated for the Colten venture. *Id.* at 48. Defendant contends that "[t]he dependency of the Colten venture on the success of the related Cane venture, and the modest rate of return anticipated even if all of the favorable assumptions made in the Behre Dolbear analysis were realized, underscored the risky nature of Colten's investment." *Id.*

Plaintiffs dispute the characterization of the Colten investment as being dependent on the Cane investment, and argue that this creates a disputed issue of material fact that precludes summary judgment. Pls.' Cross-Motion at 52–53. The court disagrees. Even assuming that the Colten investment was not dependent on the Cane property, as plaintiffs argue, the court can still analyze plaintiffs' investment-backed expectations for the property on the basis of undisputed facts. Cane's and Colten's subjective investment-backed expectations may have been slightly different, but, like Cane, Colten lacked objectively reasonable investment-backed expectations. The regulatory regime affecting Colten was the same as was in effect at the time of the Cane purchase. The court finds that the Colten purchase involved regulatory risks and those risks were knowable to a reasonable investor. *See Cienega Gardens,* 331 F.3d at 1348.

The economic diminution of the value of the Colten property caused by the Unsuitability Determination does not favor a finding of a taking. Considering only the value of coal on the Little Mountain tract, without addressing the value of timber or known income from land sales, defendant calculated the diminution of value to be 17.12% using plaintiffs' expert, or 28% using defendant's expert. Def.'s MSJ at 46. This diminution is because the great majority of the coal on Colten's property remains outside of the area

designated as unsuitable for surface coal mining by the Secretary. *Id.* Plaintiffs do not dispute this calculation. *See* Pls.' Cross-Mot at 55.[18] Taking the diminution percentage most advantageous to plaintiffs, *see generally Fabil Mfg.,* 237 F.3d at 1337, the result remains a 28% diminution in value. The court is aware of no precedent for finding a taking based on a comparable diminution of value. This economic diminution is not sufficiently substantial to support a taking claim especially where, as here, the character of the government action does not, without more, require a finding of a taking and where Colten did not have reasonable investment-backed expectations that a regulatory framework would not affect its investment. For the foregoing reasons, the court finds that no taking of Colten's property occurred. Therefore, defendant's Motion for Summary Judgment as to the Colten property is GRANTED.

### D. Temporary Taking

Before addressing plaintiffs' temporary taking claim, the court addresses two threshold issues: first, whether extraordinary delay is an essential element of a temporary takings claim; and second, whether plaintiffs can utilize a "rolling moratoria" theory of recovery.

### 1. Extraordinary Delay

■ Defendant argues that "[t]he Supreme Court's Decision in *Tahoe,* and the Federal Circuit's decision in *Boise [Cascade Corp. v. United States,* 296 F.3d 1339 (Fed. Cir.2002), *cert. denied* —— U.S. ——, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003)], make clear that, in a temporary takings claim that is premised on that phase of a regulatory decision-making process that precedes a final decision by the government agency in question, extraordinary delay during that process is required to ripen the temporary takings claim." Def.'s MSJ at 50. Plaintiffs counter that the Court in *Tahoe* stated that the *Penn Central* framework applies to temporary takings cases, and the length of delay is only

---

18. Plaintiffs argue that the court should find that the "taking" includes the "viewshed" outside the area of the Secretary's Unsuitability Determina-

tion. Pls.' Cross–Motion at 55. The court does not agree that this argument is legally tenable. *See supra* part II.C.2.a.

one factor to take into consideration. Pls.' Cross–Motion at 57 (quoting *Tahoe–Sierra,* 535 U.S. at 338 n. 34, 122 S.Ct. 1465). Plaintiffs further distinguish *Boise Cascade* because that is a permit case, and here the dispute involves the unsuitability petition process. *Id.* at 58. Unlike the permitting process at issue in *Boise Cascade,* plaintiffs argue that there is specific statutory language establishing timelines within which the petition process must be concluded. *Id.*

These arguments have largely become moot as a result of the Federal Circuit's recent decision in *Cooley v. United States,* 324 F.3d 1297 (Fed.Cir.2003). There, the court was faced with a permitting case in which a temporary taking was alleged. *Id.* at 1304–05. The court stated that "[o]nly an 'extraordinary' delay leads to compensation." *Id.* at 1306. The court made no distinction for permitting cases; it decided that, based on the precedents before it, a plaintiff must show "extraordinary" delay in order to prevail on a temporary takings claim. Thus, a finding of extraordinary delay is a condition precedent to undertaking the *Penn Central* analysis of whether a taking had occurred. *See id.* Based on this precedent from the Federal Circuit, the court finds that plaintiffs must show there was extraordinary delay to prevail on their temporary takings claim.

### 2. Rolling Moratoria

■ Plaintiffs premise their "rolling moratoria" claim on the facts that (1) OSM has uniformly denied permits to applicants who wished to mine coal from the Cumberland Plateau in Bledsoe County, (2) SOCM and other groups had successfully opposed all such mining, (3) SOCM's unsuitability petition relied extensively on the Skyline and Eastern Minerals permit proceedings and materials from those proceedings such that the petition may legitimately be deemed an outgrowth of those proceedings, and (4) the determination in response to the petition may legitimately be deemed a means to put in place a legal bar to future permit applications. Pls.' Cross–Motion at 63. Defendant counters that plaintiffs' rolling moratoria claim must be rejected as a matter of law as to the Colten property because "the petition

process that culminated with the Secretary's [unsuitability] designation is the *only* federal regulatory process involving the Colten property." Def.'s MSJ at 57. Defendant argues that this theory must be rejected as to the Cane property because the Eastern Minerals permitting process ended in February 1991 while the unsuitability petition process began October 5, 1995. *Id.* Defendant argues that this gap "forecloses Plaintiffs' rolling moratoria theory as a matter of law." *Id.* at 58.

Plaintiffs' rolling moratoria theory is based on dicta found in *Tahoe–Sierra.* In *Tahoe–Sierra,* the Tahoe Regional Planning Authority (TRPA) issued a Compact in 1980 that not only made it impossible to build apartments, condominiums, or subdivisions around Lake Tahoe, but also stated that no more building permits of any kind could be granted in 1981, 1982, or 1983 than had been granted in 1978. *Tahoe–Sierra,* 535 U.S. at 310, 122 S.Ct. 1465. Subsequent ordinances and regulations further extended these restrictions up to 1984, when suit was filed. *Id.* at 312, 122 S.Ct. 1465. In dicta, the Court stated that it was possible that it could "with the benefit of hindsight, . . . characterize the successive actions of TRPA as a 'series of rolling moratoria' that were the functional equivalent of a permanent taking." *Id.* at 333, 122 S.Ct. 1465. The Court did not so hold, however, because this was not one of the issues before it in the case. *Id.* at 334, 122 S.Ct. 1465.

While the Court in *Tahoe–Sierra* appeared to endorse the view that rolling moratoria could be the basis for a takings claim, it did not provide much guidance about how to assess such a claim. As plaintiffs state, "The Supreme Court has upheld a takings judgment on the basis of an agency having imposed sequential demands made with no real intent to grant an application or provide relief." Pls.' Cross–Motion at 63 (citing *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 698, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999)). The court does not find that to be the case here. Here, there was a significant (more than four and a half years) gap of time between the conclusion of the Eastern Minerals permitting process (February 28, 1991) affecting the Cane property, and the start of the unsuitability petition

process (October, 1995). Because of this significant period of time, there were no sequential governmental actions as to Cane. The court believes that plaintiffs themselves foreclosed the possibility of pursuing a "rolling moratoria" theory when they chose not to continue the permitting process when it ended as a matter of law in February, 1991. *See Wyatt*, 271 F.3d at 1095–97. Plaintiffs chose, in the case of Cane, to do nothing from February, 1991, to October, 1995, when the unsuitability petition was filed. Plaintiffs chose, in the case of Colten, to take no action to obtain a permit to mine from the date of acquisition of the property in 1979 until the unsuitability petition was filed 26 years later. In light of this inactivity, the court declines to entertain plaintiffs' theory that a sequence of government actions constituted "rolling moratoria" that resulted in a taking of either Cane's or Colten's property.

### 3. Temporary Taking Analysis

█ Before the court can analyze the facts of this case utilizing the *Penn Central* factors, plaintiffs must first show that there was unreasonable delay in the petition process. According to plaintiffs:

> the [petition] process was to have been completed by October 4, 1996. However, OSM projected in its contracts for work that the process might reasonably extend to February 28, 1997. In actuality, the process was not completed until June 17, 2000. The time differential between the statutory deadlines and actual events is three years, eight months, and 13 days. The differential between OSM's projection and actual events is three years, three months, and 21 days. The delay was excessive by any measure.

Pls.' Cross–Motion at 61. Plaintiffs "recognize that problems may arise in administrative proceedings that require a longer-than-normal gestation period to resolve." *Id.* at 62. However, plaintiffs argue that "by August 1998, or, at the latest, January 1999, the delays had become unreasonable." *Id.* Plaintiffs argue that summary judgment is inappropriate at this time because this is a disputed issue of material fact. *Id.*

Defendant argues that the fact that this petition process took over four years "does not, standing alone, support a conclusion that there was extraordinary delay by the government during that process." Def.'s MSJ at 54. Rather, defendant points to the Federal Circuit's opinion in *Wyatt* that government agencies should be afforded " 'significant deference' " in determining what information is needed to make the Unsuitability Determination, and that "consideration must be given to whether any delay in the regulatory process was caused by the applicant rather than the government." *Id.* at 55 (quoting *Wyatt*, 271 F.3d at 1098). Further, defendant points out, *id.*, that *Wyatt* shifted the takings analysis away from a focus on the actual length of delay as determinative of unreasonableness:

> The length of delay is not necessarily the primary factor to be considered when determining whether there is extraordinary government delay. Because delay is inherent in complex regulatory permitting schemes, we must examine the nature of the permitting process as well as the reasons for any delay. Moreover, it is the rare circumstance that we will find a taking based on extraordinary delay without a showing of bad faith.

*Wyatt*, 271 F.3d at 1098. The *Wyatt* court affords significant leeway to the executive branch in its conduct of the regulatory process absent a finding of bad faith on the part of the government.

While the unsuitability petition process in this case was not entirely expeditious, there is no evidence of bad faith on the part of the government that led to the over four-year gap between the original petition and letter of decision. In particular, the court does not attribute to the government delays caused by the petitioners or "political pressure." *See Rith*, 270 F.3d at 1352–53 (claim of "political pressure" cannot be decided in a takings case). Plaintiffs themselves acknowledge that "[c]itizens have a right to petition government, and the exercise of that right ought not to be viewed as improper in any way." Pls.' Cross–Motion at 62 n. 40. Therefore, the only delay in this process that can be attributed to the government involves problems

with the contractor that occurred at the very beginning of the petition process.

Under the schedule proposed by the government, the draft EIS was planned to be delivered to OSM on June 12, 1996. Pls.' Cross–Motion at 60. The draft EIS was actually generated in January, 1997. Pls.' Exh. 54 at 1435. The draft EIS was planned to be published on October 31, 1997, but on August 5, 1997, the citizen groups requested that this date be delayed so that the comment period would not coincide with the holidays. Pls.' Cross–Motion at 61–62; Pls.' Exh. 54 at 1439. The draft EIS was actually published on May 1, 1998. Pls.' Cross–Motion at 60; Def.'s Exh. 64 at 805. The foregoing adds up to a delay of one year, two months, and 19 days between the date when the draft EIS was planned to be published, June 12, 1996, and the date, October 31, 1997, when it was scheduled to be published before the citizen groups requested a delay. Pls.' Cross–Motion at 60; Pls.' Exh. 54 at 1439.[19]

An almost two-year delay has not been found to be extraordinary in a similar case, and the court does not find that the lesser delay here is extraordinary. *See Appolo Fuels*, 54 Fed.Cl. at 738 (finding no extraordinary delay when it took 1 year, 8 months to issue a draft EIS). With no showing of bad faith on the part of the government, the court does not find extraordinary delay, mandating compensation, where any delay beyond 15 months resulted from the government's decision to allow additional citizen input concerning a petition of substantial public interest. Because there is no extraordinary delay, there cannot be a temporary taking in this case. *Cooley*, 324 F.3d at 1305. Therefore, defendant's Motion for Summary Judgment is granted as to Cane's and Colten's temporary takings claims.

III. Conclusion

For the foregoing reasons, the Cross–Motion by Cane and Motion by the Wyatts and the Wyatt Trusts for Partial Summary Judgment that the Main Tract and the Rainey Ridge Tract Constitute Different "Parcels" and are the only Parcels Relevant to Their Claims is DENIED WITH PREJUDICE as to Cane and DENIED WITHOUT PREJUDICE as to the Wyatts and Wyatt Trusts.[20] Defendant's Motion for Summary Judgment as to the Claims of Plaintiffs Cane and Colten is GRANTED. Accordingly, the Clerk of the Court is directed to ENTER JUDGMENT for defendant in Case Nos. 96–237 L and 00–513 L. Defendant's Motion to Strike the Second Declaration of Michael Black and the February 2003 Report of James W. Boyd is GRANTED. The parties in Case No. 02–945 L shall file a joint status report on or before Tuesday, July 15, 2003, proposing further proceedings to resolve the remaining issues in this case.

IT IS SO ORDERED.

---

**19.** A 22–day government shutdown occurred during the period that the contractor was to be preparing the EIS, Pls.' Exh. 54 at 1359, a circumstance that may have contributed to the contractor's delay.

