**THOMAS CREEK LUMBER & LOG CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 623–87C.

United States Claims Court.

March 16, 1990.

Joseph A. Yazbeck, Jr., Portland, Or., for plaintiff.

Steven A. Hemmat, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, Director, and Stephen J. McHale, Asst. Director, Washington, D.C., for defendant. Roger W. Nesbit, Dept. of the Interior, of counsel.

## OPINION and ORDER

ANDEWELT, Judge.

In this government contract action, plaintiff, Thomas Creek Lumber & Log Co. (Thomas Creek), seeks damages relating to a timber sale contract (No. ORO8O–TS6–007) it entered with the United States Department of the Interior, Bureau of Land Management (BLM). Defendant filed a counterclaim seeking damages under the same contract. This action is presently before the court on defendant's motion for summary judgment. For the reasons set forth herein, summary judgment is appropriate on the issue of liability but not on the issue of damages.

## I.

In its contract with BLM, plaintiff agreed to pay $169,435.30 for timber located in a specified area of Linn County, Oregon (the Weeping Wapiti site). The contract obliged plaintiff to obtain BLM's approval of a written operations and logging plan prior to "the commencement of operations" (Section 41(h)). In addition, because of concern about damage to the property during wet soil conditions, the contract prohibited the yarding of timber "between October 15 of one calendar year and July 1 of the following calendar year" (Section 41(d)).

On February 25, 1987, the contracting officer rejected a request by Brent Walker, president of Thomas Creek, to commence logging operations outside of the seasonal restrictions imposed in Section 41(d) of the contract. Despite the contracting officer's rejection of its request, and although no logging plan previously had been approved, on March 2, 1987, plaintiff began to remove a volume of timber from the Weeping Wapiti site. In response, on that same day, BLM hand-delivered a suspension order to Mr. Walker. However, Mr. Walker instructed his contract logger to ignore the suspension order and to continue logging operations. On March 10, 1987, shortly after a meeting between the parties, plaintiff suspended its operations.

On June 8, 1987, the contracting officer issued a final decision to the effect that plaintiff was liable for $43,347.11 in damages as a result of its violation of the suspension order. The contracting officer calculated the amount of damages due by trebling the fair market value of the timber removed during the suspension period ($13,558.37) and then adding $2,672.50 in related expenses incurred by BLM. On or about July 8, 1987, plaintiff paid defendant $7,129.59 in damages. Plaintiff then filed suit in this court contesting the contracting officer's decision. Defendant filed a counterclaim seeking the balance of alleged damages due ($36,217.52), plus statutory interest.

In its motion for summary judgment, defendant contends that the suspension or-der was proper under the terms of the contract and that even if it was not, plaintiff was obliged to obey the suspension order until it was rescinded. With respect to damages, defendant contends that it was appropriate for the contracting officer to calculate damages based on the fair market value of the timber at the time it was removed. In its response, plaintiff disputes that the suspension order was warranted, contends that it was not obliged to obey an unwarranted suspension order, and alleges that, in any event, the contract price for the timber, and not the fair market value, should be used in assessing damages.

## II.

The issue of whether the suspension order was proper appears to turn on whether the timber plaintiff cut and removed from the Weeping Wapiti site on March 2, 1987, was classifiable as "right-of-way" timber. Defendant agrees with plaintiff that there is no provision in the contract that prohibited plaintiff from removing "right-of-way" timber on March 2.

Defendant presents extensive evidence to support its contention that the timber plaintiff cut and removed on March 2 was not necessary to secure any "right-of-way" for harvesting and therefore was removed in violation of contract requirements. In response, plaintiff relies primarily on an affidavit by Mr. Walker in which he states that all of the timber cut and removed prior to and during the suspension period was "right-of-way" timber. Mr. Walker acknowledges that extensive amounts of "right-of-way" timber were removed prior to March 2, but contends that additional "right-of-way" timber remained on the site. He contends that Thomas Creek was going to use a yarder with a 100–foot tube to harvest timber under the contract and that additional "right-of-way" timber had to be removed from the site to make room for transporting the tube.

Defendant's evidence as to the proper classification of the timber in question appears somewhat more persuasive than plaintiff's. But when considering a sum-

mary judgment motion, it is not the role of a court to weigh the evidence and resolve such factual disputes. Rather, a court's role is limited to determining whether a genuine dispute exists as to a material fact. If such a dispute does exist, a motion for summary judgment must be denied. RUSCC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986). Herein, significant evidence has been presented on both sides, and there is a dispute as to whether the timber removed on March 2 was "right-of-way" timber. In view of this factual dispute, the court cannot determine on summary judgment whether the suspension was authorized under the terms of the contract. Therefore, if the correctness of the suspension is material to resolution of the merits of this case, summary judgment would not lie.

### III.

■ Defendant contends that, in any event, the correctness of the suspension order is not material to its summary judgment motion because plaintiff is obliged to follow the terms of the suspension order even if the order was unwarranted. Defendant is correct. The cutting and removal of timber in violation of a suspension order is covered under Section 10(b) of the contract, which provides, in pertinent part: "If Purchaser cuts or removes any timber sold under this contract during any period of suspension, such cutting or removal shall be considered a wilful trespass and render Purchaser liable for damages under applicable law." Thus, Section 10(b) imposes potential damage liability for *any* cutting or removal of timber sold under the con-

tract during a suspension period. There is no requirement that the suspension order be correctly issued.

Plaintiff does not dispute that its conduct falls within the literal scope of the prohibition in Section 10(b), *i.e.*, that it removed timber sold under the contract during a suspension period. Rather, plaintiff contends, in effect, that the Section 10(b) prohibition should not be interpreted literally. First, plaintiff contends that since it previously had paid for the "right-of-way" timber removed during the suspension period, it owned the timber and was therefore entitled to remove it. However, Section 7 of the contract provides that title to timber sold under the contract does not pass until such timber "has been paid for *and removed* from the contract area." (Emphasis added.) Since the timber involved herein had not been removed from the contract area prior to the suspension order, title remained with BLM and plaintiff's removal of the timber during the suspension period was in violation of Section 10(b).

■ Next, plaintiff contends that Sections 3(c) and 3(d) of the contract support its right to remove the timber notwithstanding the prohibition in Section 10(b). Section 3 generally concerns plaintiff's payment of money due under the contract. Section 3(b) permits payments to be made on an installment basis at specified times. Sections 3(c) and 3(d) involve performance and payment bonds, respectively, and both sections provide that if the applicable bond exceeds a certain amount, the cutting of timber "may be permitted prior to the payment of the first installment or subsequent installments." [1] Thus, contrary to plain-

---

1. Sections 3(c) and 3(d) provide:

(c) If Purchaser increases its performance bond as permitted by Sec. 38(b), cutting of timber of a value not in excess of the increase in value of such bond may be permitted prior to the payment of the first installment or subsequent installments; *Provided, however,* that no timber may be skidded or yarded to a loading point or removed from the contract area prior to payment of any installment which, but for provisions of this subsection, would otherwise be due under the provisions of Sec. 3(b).

(d) If Purchaser provides a payment bond, as permitted by Sec. 38(d), cutting and/or removal of timber of a value not in excess of the penal sum of such bond may be permitted prior to the payment of the first installment or subsequent installments. Unless a shorter period is agreed to by Purchaser and Government, Government shall bill Purchaser monthly for timber skidded or yarded to a loading point or removed from the contract area. Such billing shall include any amount due for related road maintenance fees. Purchaser shall make payment within fifteen (15)

tiff's interpretation, Sections 3(c) and 3(d) do not grant plaintiff any absolute right to cut timber when bonds are posted, they merely provide that "cutting ... *may be* permitted." (Emphasis added.) Neither provision suggests an exception to the prohibition and liability expressly provided in Section 10(b).

A literal interpretation of Section 10(b) does not, as plaintiff suggests, produce an unconscionable result. Plaintiff is not left without a route to secure relief in an instance where the government incorrectly suspends performance of the contract. Plaintiff may file a claim with the contracting officer under Section 37 of the contract, which provides, in pertinent part: "If a dispute arises relating to the contract, the purchaser may submit a claim to the Contracting Officer who shall issue a written decision on the dispute ..." (Section 37(a)). The claim may be "[f]or payment of money, adjustment of contract terms, or other relief" (Section 37(b)). This procedure adequately protects plaintiff's interests if a suspension order is improperly issued.

Since there is no dispute that plaintiff removed timber during the suspension period in violation of Section 10(b), defendant is entitled to summary judgment on the issue of liability. Pursuant to Section 10(b), plaintiff's cutting and removal of timber during the suspension period "shall be considered a wilful trespass and render [plaintiff] liable for damages under applicable law."

### IV.

■ The remaining issue is the extent of damages. The parties agree that Oregon law applies. Under Oregon law, when a wilful trespass results in the unauthorized removal of timber, the trespasser must pay as damages to the landowner treble the landowner's actual damages. *United*

*States v. Firchau,* 380 P.2d 800, 805 (Or. 1963).[2] Since Section 10(b) classifies plaintiff's actions as "wilful trespass," this court must assess defendant's actual damages and then treble that amount. The only actual damage defendant alleges herein is the loss of the timber removed in the course of the trespass. Hence, to assess actual damages, it is necessary for this court to place an appropriate value on that timber.

Defendant contends that the value that should be used is the stumpage value of the timber at the time it was removed, *i.e.,* the fair market value of the standing timber at the time of the trespass. In the typical case, defendant would be correct. *See Gerdes v. Bohemia, Inc.,* 88 Or.App. 62, 744 P.2d 275, 278 (1987). The stumpage value ordinarily would be an appropriate measure of the value of the timber to the landowner because in a typical case, at the time of the trespass the landowner could have sold that timber at the then-current stumpage price. But this case is not typical because the landowner had entered into a contract in which it had agreed to sell all timber on the land at a specified contract price. By entering a contract, BLM, in effect, transferred the potential benefits and risks of post-contract fluctuations in the fair market value of the timber to the contractor. If the fair market value increased beyond the contract price, the contractor stood to benefit; if the fair market value decreased, the contractor stood to lose. In either case, the value of the timber to BLM remained the same. Since the contract price, rather than the fair market value, measured defendant's economic interest in the timber removed during the suspension period, it is appropriate to value that timber at the contract price when assessing defendant's actual damages. *See,*

days of the billing date shown on the billing form.
(Emphasis in original.)

**2.** The applicable Oregon statute provides, in pertinent part:
Whenever any person without lawful authority, *wilfully injures or severs from the land of*

another any tree, timber, or shrub on the land of ... the United States ... in an action by ... the United States ... against the person committing such trespasses if judgment is given for the plaintiff, it shall be given for treble the amount of damages claimed, or assessed for the trespass.
Oregon Revised Statute § 105.810.

*e.g., Restatement (Second) of Contracts* § 347 comment a (1979).

Defendant argues that using the contract price in calculating damages would improperly permit plaintiff to get the benefit of the contract terms when plaintiff removed the timber in violation of the contract rather than pursuant to it. But the contract establishes the method for calculating damages. Under the contract, damages are calculated according to Oregon law which requires an assessment of actual damages and then a trebling of that amount. As explained above, the actual damage that defendant suffered was the unauthorized removal of the timber. The economic harm that resulted was that defendant was unable to sell the timber to plaintiff at the contract price. Therefore, if defendant received the contract price for the timber removed, the actual economic damage defendant suffered would be fully addressed and defendant would be made whole.

This is not to say, however, that the contract envisions plaintiff simply paying the same price for timber whether it is taken pursuant to or in violation of the contract. Indeed, the contract provides a financial penalty for such unauthorized removal of timber. But that penalty does not involve artificially increasing the actual damages by valuing the timber at the fair market value at the time of the trespass. Rather, the penalty stems from an award to the landowner under Oregon law of three times actual damages.

Contrary to defendant's contention, the last sentence in Section 10(b) does not demonstrate an intent to calculate damages using the fair market value of the timber removed at the time of the trespass. Section 10(b) provides, in pertinent part: "Any payment made for purchase price of timber cut or removed in trespass shall be deduct-ed to the extent of single damages or the value of timber under this contract, whichever is lesser, from amount due because of trespass." Defendant contends that this sentence would be "devoid of any meaning" if damages are measured by the contract price. Defendant's apparent rationale is that there would be no reason to distinguish between single damages and the contract price in Section 10(b) if the contract price was the correct measure of single damages.

But under Oregon law, the value of the timber taken is only one component in the calculation of actual damages. The amount of actual damages is increased to reflect any other economic harm done to the land and decreased to reflect any improvements to the land that resulted from the trespass. *See, e.g., Gerdes v. Bohemia,* 744 P.2d at 279 (value of a road built by a wilful trespasser was "relevant to the value of the property before and after logging and thus should have been deducted from [the plaintiff's damages] before the amount was trebled"). Therefore, Oregon law treats single damages as distinct from the value of the timber taken and recognizes that depending on the particular facts of a case, single damages may be more or less than the value of the timber. Hence, the interpretation of Section 10(b) adopted by the court would not render any term therein redundant or devoid of meaning.[3]

Indeed, rather than supporting defendant's approach, the language of Section 10 tends to support the use of the contract price in assessing damages. First, Section 10(a) provides, in effect, that defendant's obligation to sell timber on the contract site at the contract price does not end when timber is taken in violation of a suspension order. Under Section 10(a), the government is prohibited from cancelling the contract unless the contractor fails to remedy the violation within 30 days after receipt of

---

**3.** Under Section 10(b), the contractor may deduct from treble damages all payments previously made for the purchase of the timber that was taken during a suspension period, but only to the extent of the lesser of single damages or the value of the timber under the contract. Thus, if the contract value of the timber taken is less than single damages (*i.e.,* there are actual damages in addition to the removal of the timber), plaintiff can only deduct payments made for the timber up to its contract value. If the contract value of the removed timber is greater than single damages (*i.e.,* there were improvements to the land in the course of the trespass), plaintiff can deduct payments made for the timber up to the full amount of single damages.

a suspension notice.[4] Thus, if plaintiff ceases its violation of the suspension order within 30 days, defendant is obliged to reinstate the contract and continue to sell the timber at the contract price.

Second, Section 10(b) mandates that a contractor who removes timber during a suspension period be treated as a "wilful trespasser." If the wilful trespass was perpetrated by a third-party rather than plaintiff, BLM reasonably could not have claimed that it was damaged to the extent of the fair market value of the timber removed. BLM's damages would be limited to the contract price since it had agreed to sell the timber at that price to plaintiff. Plaintiff would have had its own damage claim because, if not for the trespass, it could have purchased the timber at the contract price and then sold it at the higher prevailing fair market price. Consequently, limiting BLM's actual damages to the contract price for the timber would result in plaintiff being treated in the same manner as any third-party trespasser.

### V.

Pursuant to the analysis set forth above, defendant's actual damages should be calculated by valuing the timber removed during the suspension period at the contract price. The actual damages should then be trebled. However, at this point, it is not possible to resolve the issue of damages on summary judgment because there is a dispute between the parties as to the precise amount of timber removed. The parties indicated at oral argument, however, that if the court resolved the other outstanding issues, they likely would be able to reach a stipulation as to the amount of timber removed.

Consequently, the parties shall attempt to reach a stipulation as to the amount of timber removed during the suspension period and as to the total damages that would be due under the legal analysis articulated by the court above. The parties shall file a joint status report on or before April 16, 1990, containing such stipulations or advising the court as to why such stipulations could not be reached.

IT IS SO ORDERED.

---

4. Section 10(a) provides:

> If Purchaser violates any provision of this contract, the Authorized Officer may, by written notice, suspend any further operations of Purchaser under this contract, except such operations as may be necessary to remedy the violation. If Purchaser fails to remedy the violation within thirty (30) days after receipt of a suspension notice, the Authorized Officer may, by written notice, cancel the rights of the Purchaser under this contract and take appropriate action to recover all damages suffered by Government by reason of such violation, including application toward payment of such damages of any advance payments and any performance bonds or, where applicable, any payment bonds; *Provided, however,* that if the violation involves nonpayment of amounts due for timber cut and/or removed under a payment bond of a corporate surety, the Authorized Officer must, in addition to the above requirements, allow sixty (60) days after making demand upon surety for any payment due before cancelling the rights of Purchaser.

(Emphasis in original.)