CANE TENNESSEE, INC.,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 96–237 L.

United States Court of Federal Claims.

Oct. 3, 2003.

Matthew D. Slater, Washington, DC, for plaintiffs.

Kristine S. Tardiff, with whom was Thomas L. Sansonetti, Assistant Attorney General, United States Department of Justice, Washington, DC, for defendant. Daniel W. Kilduff, Office of the Solicitor, United States Department of the Interior, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

Before the court are Plaintiffs' Motion for Reconsideration (Pls.' Mot. or Motion), Defendant's Response to Plaintiffs' Motion for Reconsideration (Def.'s Resp.), and Plaintiffs' Reply in Support of Their Motion for Reconsideration (Pls.' Reply). For the following reasons, plaintiffs' motion for reconsideration is GRANTED IN PART AND DENIED IN PART.

In their Motion, plaintiffs allege that certain factual and legal mistakes were made in the court's opinion filed on June 27, 2003, *Cane Tennessee, Inc. v. United States*, 57 Fed.Cl. 115 (2003) (*Cane*). Pls.' Mot. at 1–2. Specifically, plaintiffs argue that the court "acted on erroneous premises" when it determined that the relevant parcel for the takings analysis respecting Cane's claims are all tracts owned by Cane (Relevant Parcel Issue). Pls.' Mot. at 3. Plaintiffs also argue that the timber valuation data the court used in its takings analysis was "directly against the grain of plaintiffs' contrary record evidence" (Timber Valuation Issue). *Id.* at 6–7. Plaintiff argues that the court's erroneous perception of the timber valuation data resulted in, among other things, the court's error in granting defendant's motion to strike the second declara-

tion of Mr. Black and Mr. Boyd's February 2003 expert report (Black's Second Declaration and Boyd's February 2003 Report Issue). *Id.* at 10–12. Finally, plaintiffs argue that the court's conclusion that Cane did not have reasonable investment-backed expectations "diverges critically from the arguments and evidence put before the [c]ourt" (Reasonable Investment–Backed Expectations Issue). *Id.* at 13. Plaintiffs seek reconsideration pursuant to Rule 59(a) of the Court of Federal Claims (RCFC).

■ Rule 59(a) affords this court the discretion to grant reconsideration "to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59(a). *See Yuba Natural Res., Inc. v. United States,* 904 F.2d 1577, 1583 (Fed.Cir.1990). A showing in support of the motion "must be based 'upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court.' " *Fru–Con Constr. Corp. v. United States,* 44 Fed. Cl. 298, 300 (1999), *aff'd,* 250 F.3d 762 (Fed. Cir.2000) (quoting *Bishop v. United States,* 26 Cl.Ct. 281, 286 (1992)). A party moving under RCFC 59 "does not persuade the court to grant … a motion [for reconsideration] by merely reasserting arguments which were previously made and were carefully considered by the court." *Coconut Grove Entertainment, Inc. v. United States,* 46 Fed.Cl. 249, 255 (2000). *See also Gelco Builders & Burjay Constr. Corp. v. United States,* 177 Ct.Cl. 1025, 369 F.2d 992, 1000 n. 7 (1966). The court also notes that "[r]econsideration enables a trial court to address oversights, and the court appreciates the opportunity to do so." *Fru–Con,* 44 Fed.Cl. at 315.

The court turns now to address each of the four issues raised by plaintiffs.

### 1. Relevant Parcel Issue

Plaintiffs challenge the court's relevant parcel determination. Plaintiffs assert that "[i]n deciding that the relevant parcel for the takings analysis respecting Cane's claims would be the combined group of four separate non-contiguous tracts owned by Cane, the Court acted on [three] erroneous premises." Pls.' Mot. at 3. First, plaintiffs draw the court's attention to the statement in the Opinion that "[w]hen the Cane purchase was completed, all tracts were transferred to Cane on the same deed." *Id.* at 4 (quoting *Cane,* 57 Fed.Cl. at 122). Plaintiffs state that the tracts were not transferred to Cane on the same deed but by two separate deeds. *Id.* Second, plaintiffs challenge the statement in the Opinion that "the deed did not state separate consideration for the various tracts." *Id.* (quoting *Cane,* 57 Fed.Cl. at 122). Plaintiffs contend that separate consideration was stated for each of the two deed transactions. Pls.' Mot. at 4. Third, plaintiffs dispute the statement that "there [were] no plans or proposals to develop the separate tracts independently of each other." *Id.* (quoting *Cane,* 57 Fed. Cl. at 122). Plaintiffs assert that certain coal deposits were "independently developable." *Id.* at 5.

### a. Two Deeds

With respect to whether Cane's property was transferred to it in one or two deeds, plaintiffs are correct that the transfer was made in two deeds. The first deed, dated February 13, 1979, conveyed three tracts, including the Rainey Ridge tract.[1] Pls.' Mot. at 4; Exhibits to Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment Respecting the Timing and Scope of Temporary and Permanent Takings of Plaintiffs' Coal Estates and Respecting the "Denominator" Applied to the Takings Analysis (Pls.' Ex.) 46 at 1045–1051. The second deed, dated February 15, 1979, conveyed two tracts, including the Main tract.[2] Pls.' Mot. at 4; Pls.' Ex. 10 at 218–226. The court focuses on the acquisition of the Rainey Ridge and Main tracts because, as plaintiffs explained in the summary judgment briefing, the claims of Cane, the Wyatts, and the Wyatt Trusts concern only the Main tract

---

1. The first deed also conveyed the Higgenbotham Ridge and Grape Knob tracts. Pls.' Mot. at 4; Pls.' Ex. 46 at 1046–1047.

2. The second deed also conveyed the Pilot Knob tract. Pls.' Mot. at 4; Pls.' Ex. 10 at 219.

and the Rainey Ridge tract. *See Cane* 57 Fed.Cl. at 121 n. 6.

The court does not believe, however, that this factual error in the Opinion materially affects the relevant parcel determination. The first deed transferred property that was owned at that time by Wilson W. Wyatt, Sr. and Anne D. Wyatt. Pls.' Ex. 10. The second deed transferred property that was owned at that time by Wilson W. Wyatt, Jr., as Trustee. Pls.' Ex. 46. The two deeds were prepared by the same law firm, Wyatt, Grafton & Sloss, *see* Pls.' Ex. 10 at 218; Pls.' Ex. 46 at 1045, and the deeds were recorded on February 16, 1979 in Deed Book 87 in Bledsoe County, Tennessee, consecutively and within two minutes of each other. *See* Pls.' Ex. 10 at 226; Pls.' Ex. 46 at 1051.

■ Property acquired through separate deeds can nonetheless be treated as a single relevant parcel in a takings analysis. In *Forest Properties, Inc. v. United States*, 39 Fed.Cl. 56 (1997), *aff'd*, 177 F.3d 1360 (Fed. Cir.), *cert. denied sub nom. RCK Prop., Inc.*, 528 U.S. 951, 120 S.Ct. 373, 145 L.Ed.2d 291 (1999), the court found "that the parcel as a whole ... includes the 9.4 acres of lakebottom property and the inextricably linked 53 acres of upland property [acquired five months earlier than the lakebottom property]." *Id.* at 67. Declining to "elevate the style of the transaction over the substance of a property owner's treatment of a parcel," *id.* at 74, the court rejected plaintiff's position that the relevant parcel was the 9.4 acre parcel based on the " 'separateness' " of the transactions. *Id.* at 73.

■ In this case, the court found that the undisputed evidence demonstrated that "Cane treated all the tracts it purchased as one entity," *Cane*, 57 Fed.Cl. at 121–22, and that determination is not disturbed by the existence of two deeds of conveyance.

b. Consideration

■ Challenging the statement in the Opinion that the deed of conveyance "did not state separate consideration for the various tracts," Pls.' Mot. at 4 (quoting *Cane*, 57 Fed.Cl. at 122), plaintiffs urge the court to reconsider its relevant parcel determination on the basis that the two property transfers stated separate consideration for each transaction. *Id.* Plaintiffs state that "[t]he first deed, relating to the three outlying tracts, is accompanied by an 'Affidavit of Value,' affirming that the 'actual consideration' for the transfer was '$1,000,000.00.' " *Id.* (citing Pls.' Ex. 46 at 1051). Plaintiffs add that "[t]he second deed, for the Main tract and Pilot Knob, is accompanied by an affidavit affirming that the 'actual consideration' for that particular transfer was '$4,100,000.00.' " *Id.* (citing Pls.' Ex. 10 at 226).

Based on the factual error in the Opinion that the tracts were conveyed by one rather than two deeds, plaintiffs misconstrue the court's reasoning with respect to the consideration issue. The lynchpin of the court's reasoning is simply that in the conveyance of the five tracts of land by the two deeds, the consideration for each of the tracts was not separately stated. The court views the failure to state separate consideration for the individual tracts as evidence that the collection of the individual tracts was treated as a single parcel of land. As defendant correctly observes, this view is consistent with the pre-purchase documentation relied on by the Opinion, *see Cane*, 57 Fed.Cl. at 122 & n. 8, that "treats the proposed purchase as a single transaction in which Cane would acquire 'one large tract of about 8,000 acres and four nearly contiguous tracts each of about 500 acres' for $5 million ...." Def.'s Resp. at 5 (quoting Pls.' Ex. 6 at 73 and citing *id.* at 85). Defendant also correctly observes that "all of the tracts acquired by Cane were immediately thereafter leased to Eastern Minerals by a single lease." *Id.* (citing Pls.' Ex. 12). The court has carefully reconsidered plaintiffs' points and remains satisfied that the evidentiary record relating to consideration for the property supports no genuine issue of fact material to the court's finding that Cane acquired the tracts as a single parcel and managed the tracts as a single investment over time.

c. Development Plans

■ Relying on the pre-purchase report prepared by Behre Dolbear & Company

(Behre Dolbear),[3] plaintiffs assert that the various tracts contained "'recoverable reserves of both the Lantana and the Sewanee coal seams.'" Pls.' Mot. at 4–5 (quoting Pls.' Ex. 6 at 69). Plaintiffs urge the court to reconsider its relevant parcel determination because the coal seams present on the property were "independently developable." *Id.* at 5.

As an initial matter, the court notes that plaintiffs' assertion that the coal seams were "independently developable" does not directly contradict or address the conclusion in the Opinion of which plaintiff complains, that "there [were] no plans or proposals to develop the separate tracts independently of each other." *Cane,* 57 Fed.Cl. at 122. Notwithstanding this circumstance, which itself appears to exceed the proper grounds for reconsideration, the court addresses plaintiffs' argument.

Plaintiffs' argument is based on a newly-proposed analysis of the pre-purchase report.[4] Of the two coal seams, the Behre Dolbear report identified the Sewanee seam to be "of greatest importance in terms of quantity of [coal] reserves and market price." Pls.' Ex. 6 at 75. Estimating the recoverable reserves of the Lantana seam to be "at best one-tenth of the Sewanee recoverable reserves," the Behre Dolbear report noted that, although the Lantana reserves could "either . . . ease capital requirements during the development of the Sewanee, or . . . augment Sewanee production once the Sewanee is developed," such uses of the Lantana were not incorporated into the economic assessment. *Id.* at 69. Rather, the pre-purchase economic assessment of the property focused on the economic potential of the development of one coal seam, the Sewanee, located on the

Main tract. *See* Pls.' Ex. 6 at 103–105. Similarly, an investment advisory report prepared by Citibank identified as an attractive feature of the investment property "a vast quantity of excellent-quality coal reserves." Pls.' Ex. 7 at 145.

Notwithstanding the possibility of separate development proposed now by plaintiffs, the record reflects that Cane leased the entire property to Eastern Minerals in 1979 with a clause stating that "[t]enant shall begin mining operations under this Lease as promptly as practicable and shall at all times diligently, with continuity . . . and in a good workmanlike manner and in accordance with good mining practice prosecute mining operations *until all of the minable and merchantable coal . . . in the Land has been mined and removed . . . .*" Pls.' Ex. 12 at 247. Based on its examination of the evidentiary record and given the absence of any evidence in the record of an independent development plan, it remains the view of the court that a single development plan existed and was executed for the various tracts of land at the time of Cane's purchase.

### 2. Timber Valuation Issue

■ Plaintiffs challenge the statement in the Opinion that "[i]n an expert report dated January 18, 2002, . . . plaintiffs' timber expert, Michael Black, valued timber on the Cane property as $3,944,313." Pls.' Mot. at 7 (quoting *Cane,* 57 Fed.Cl. at 124). Plaintiffs contend that sum reflected a "'gross' estimated [timber] value" and not "the timber value for Cane." *Id.* Plaintiffs argue that the "['gross timber value' of $3,944,313] greatly overstated the timber value on Cane's property" because it did not reflect any downward adjustment in value for the following

---

**3.** Prior to Cane's purchase of the property, Behre Dolbear performed an "independent" assessment to evaluate "[t]he economic potential of a mining operation" on the subject property. Pls.' Ex. 6 at 68–69, 76. The results of that study are contained in Behre Dolbear's report of December 1978 styled "An Economic Assessment of the Coal Underlying the Wyatt–Bernos Property Near Dunlap, Bledsoe County, Tennessee." *Id.* at 69.

**4.** Indeed, the sentence from the Behre Dolbear report on which plaintiff relies for its assertion

that the property contains "'recoverable reserves of both the Lantana and the Sewanee coal seams,'" Pls.' Mot. at 4–5, provides in full:

> While recoverable reserves of both the Lantana and the Sewanee coal seams are present within the boundaries of the property, the economic potential of the property rests with the Sewanee seam.

Pls.' Ex. 6 at 69. It is clear from this sentence alone that there was no independent development plan for the separate tracts at the time of purchase.

three considerations: (1) a southern pine beetle infestation adversely affecting pine trees; (2) timber located within Streamside Management Zones (SMZs) or on steep slopes;[5] and (3) the owner's costs and expenses of sale.[6] Pls.' Mot. at 7 (emphasis omitted). Plaintiffs assert that "Mr. Black *never* provided an actual estimate of timber value for Cane that took account of these [three] reductions." Pls.' Mot. at 7. Rather, plaintiffs explain, Mr. Black "provided a 'gross' estimate derived in the same way as the government expert's estimate, and then gave [the three] reasons why [such estimate] was *not valid* ... as a true stumpage value ...." *Id.*

Ascertaining the proper timber valuation of plaintiffs' property was part of the court's analysis of the economic impact of the regulatory action in this takings case. As the court stated in its Opinion, "[e]conomic impact for a takings analysis is determined by comparing the market value of the property at a moment in time just before the government action with the market value [of the same property] just after the government action." *Cane,* 57 Fed.Cl. at 124 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)("[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property.")). The government action triggering the takings analysis in this case occurred on June 17, 2000 when Secretary Babbitt issued his letter of decision designating a significant portion of plaintiffs' property unsuitable for surface coal mining. *See Cane* 57 Fed.Cl. at 120. In this case, the valuation determination compared the coal value (what plaintiffs lost) with the fair market value of the property just before the taking, measured as the coal value plus the timber value. *Id.* at 123–125.

Upon review of the parties' briefing, it appears to the court that underlying plaintiffs' challenge to the timber valuation determination is the issue of the proper legal standard for determining the fair market value of the timber.

In *Thomas Creek Lumber & Log Co. v. United States,* 19 Cl.Ct. 710, 713 (1990), *aff'd,* 928 F.2d 411 (Fed.Cir.1991), this court stated that "stumpage value ordinarily [is] ... an appropriate measure of the value of the timber to the landowner" because it is the fair market value of the timber. *See also Gerdes v. Bohemia, Inc.,* 88 Or.App. 62, 744 P.2d 275, 278 (1987) ("Generally, stumpage value is the market value of timber before it is cut; the amount that a purchaser would pay for standing timber to be cut and removed."). Among the factors a court may consider in determining stumpage value are "the quantity and quality of the estimated board feet in the trees, existing cutting practices, cost estimates for removal and difficulty in logging with respect to the condition of the land." *Id.,* 744 P.2d at 279. *See also Klukwan, Inc. v. Comm'r,* No. 14342–92, 1994 WL 444446 (T.C.1994), 68 T.C.M. (CCH) 446, 451 (1994) (in determining the fair market value of timber, "[a]ll factors that would affect the selling price of the subject timber must be considered ... [i]nclud[ing] ... the character, quality, quantity, and location of the timber, as well as its accessibility.")

Consistent with such authorities, plaintiffs' expert, Mr. Michael Black, stated in the "Timber Appraisal" portion of his expert report that "[t]he purpose of this [s]ummary is to estimate the market value of all merchantable and standing timber ('stumpage') located on the Cane property." Pls.' Ex. 43 at 995. In deposition testimony, Mr. Black stated

---

5. Mr. Black stated in his deposition that "as a forester managing that property," it was his professional opinion and "a very commonly accepted rule of thumb" that cutting all the merchantable timber and leaving the SMZs will typically cause a 15 to 20 percent loss of acreage. Pls.' Ex. 37 at 847. Mr. Black explained that harvesting within a SMZ is a voluntary practice under Tennessee state law which permits the removal of up to 50 percent of the overstory, defined by Mr. Black as "the crown of trees that intercon-

nect across the stream [and] provide the majority of the shade." *Id.* Notwithstanding the potential presence of merchantable timber within a SMZ, Mr. Black noted that, "[o]n my sales, as a general rule of thumb we do not enter into streamside management zones." *Id.*

6. The owner's costs and expenses of sale are also described as "harvesting and replanting costs." Pls.' Reply at 6.

that when he performed an appraisal to determine the market value of timber, he conducted "[a] field inventory of the standing timber ... to determine the species distribution, various products on the property, determine the acreage of the property, and then that inventory was assigned product values and predicted stumpage rates that the landowner could expect to receive on a sale." Pls.' Ex. 37 at 831. Mr. Black estimated that, in June 2000, the total gross timber value of Cane's property was $3,944,313. Pls.' Ex. 43 at 996. Mr. Black noted, however, that adjustments to this "gross" estimate of value were necessary to reflect the southern pine beetle infestation problem, the harvesting limitations within the SMZs, and the costs associated with dead tree disposal to reduce fire hazards. *Id.;* Pls.' Ex. 37 at 852. Plaintiffs correctly point out, Pls.' Mot. at 7–8, that these adjustments were not incorporated into the calculation of fair market value in the Opinion.

In deposition testimony, defendant's expert, Mr. Wayne Williams, explained that he assessed the value of the standing timber by "putting a dollar value on the volume" of standing timber. Pls.' Ex. 36 at 797. Mr. Williams opined that in June 2000, a knowledgeable timber buyer would have paid Cane $4,247,078 for the standing timber on its property. *Id.* at 798. Assessing the value of standing timber only, Mr. Williams did not adjust his stumpage valuation to reflect the beetle infestation problem, *id.* at 801, or harvesting limitations within the SMZs. *Id.* at 802–803.

In their briefing requesting reconsideration, plaintiffs focused on the factual details underlying the different calculation methods used by their expert. Pls.' Mot. at 7–10. However, the court believes that whether genuine issues of material fact exist that preclude summary judgment disposition turns on the proper legal standard for establishing the fair market value of plaintiffs' timber in June 2000. After review of authorities on fair market value, the court finds it proper to take into account circumstances affecting harvesting costs and similar matters. The court therefore finds, on reconsideration, that the issues of beetle infestation, the existence of streamside management zones and the costs associated with salvage could involve genuine issues of material fact which preclude summary judgment on the issue of timber valuation.

3. Black's Second Declaration and Boyd's February 2003 Report Issue

Plaintiffs seek reconsideration of the portion of the court's opinion granting Defendant's Motion to Strike the Second Declaration of Michael Black (Black's Second Declaration) and the Forthcoming Further Supplemental Expert Report of James W. Boyd (Boyd's Expert Report). Pls.' Mot. at 10–13. *See Cane,* 57 Fed.Cl. at 125 & 125 n. 12.

Plaintiffs argue that Black's Second Declaration should not have been stricken "because it did not feature a 'new' methodology, but merely quantified factors explained in Black's First Declaration." Pls.' Reply at 9. Plaintiffs assert that Black's Second Declaration "explain[s] the degree of damage caused by the Southern Pine Beetle infestation that was epidemic on the Main Tract by June 2000.... [and] sets out the total timber harvesting revenues obtained through the salvage timber harvest ...." Pls.' Mot. at 11 (emphasis omitted). Plaintiffs contend that this information is "pertinent" to the timber valuation. *Id.*

By this motion, plaintiffs "merely reassert[ ] arguments which were previously made and were carefully considered by the court." *Coconut Grove Entertainment, Inc. v. United States,* 46 Fed.Cl. at 255. As the court observed in its Opinion, Black's Second Declaration, dated January 28, 2003, states in the first paragraph that it is "based on 'events that have occurred since the January 2002 Report and my June 2002 Declaration.'" *Cane,* 57 Fed.Cl. at 124 (quoting Pls.' Ex. 59 at 1487). The court stated:

> Economic impact for a takings analysis is determined by comparing the market value of the property at a moment in time just before the government action with the market value just after the government action. The difference between these two figures is the compensation to which a plaintiff may be entitled. Events that oc-

curred well after the June 2000 date when the taking allegedly occurred do not appear to be relevant to the market value of the timber on that date.

*Id.* at 124 (citations omitted). The court remains unpersuaded that the later occurring "events" addressed in Black's Second Declaration are relevant to the timber valuation at the time of the taking.

Plaintiffs also challenge the court's decision to strike Boyd's Expert Report prepared in February 2003. Pls.' Mot. at 12. Plaintiffs assert that "to ensure the future availability of the February 2003 Boyd Report for use by the Wyatts and Wyatt Trusts in these consolidated cases, it should not have been stricken." *Id.*

As the court stated in its Opinion, its "review[ ][of] economic data at this juncture" [was] limited to an "assess[ment] [of] Cane's and Colten's takings claims." *Cane,* 57 Fed. Cl. at 125 n. 12. The court further stated that "[t]he Wyatts' and Wyatt Trusts' takings claims [were] not before the court in the pending motions." *Id.* The court's decision does not preclude consideration of evidence relevant to the claims of the Wyatts and Wyatt Trusts timely presented to the court in appropriate proceedings.

Accordingly, after reviewing plaintiffs' motion for reconsideration on this portion of its Opinion, the court declines to disturb its decision granting Defendant's Motion to Strike the Second Declaration of Michael Black and the Forthcoming Further Supplemental Expert Report of James W. Boyd remains undisturbed.

4. Reasonable Investment–Backed Expectations Issue

Plaintiffs seek reconsideration of the court's conclusion that "[b]ecause a reasonably prudent investor could not have believed that its investment was without regulatory risk, Cane cannot now claim that it had reasonable investment-backed expectations that were unexpectedly impacted by government action." *Cane,* 57 Fed.Cl. at 127; *see also* Pls.' Mot. at 12–16. Plaintiffs argue that "the existence of a regulatory regime cannot, by itself, be a basis for holding that there cannot be reasonable investment-backed ex-

pectations." Pls.' Mot. at 13 (citing *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) and *Cienega Gardens v. United States,* 331 F.3d 1319 (Fed.Cir.2003)). Asserting an absence of record evidence on the subject, plaintiffs contend that the court lacked an "objective basis" for stating in its Opinion that " 'plaintiff [Cane] appears to have been ignorant' about the possibility of an unsuitability proceeding." Pls.' Mot. at 14 (quoting *Cane,* 57 Fed.Cl. at 127). Plaintiffs state that the silence of the parties on the subject of Cane's knowledge precludes summary judgment disposition of the issue because the "[a]uthors of the pre-purchase coal report, Behre Dolbear, could be called to testify about whether they considered in January 1979 the possibility of an unsuitability petition and whether such a possibility was objectively foreseeable at that time." Pls.' Mot. at 14 n. 16.

In its opinion, the court states:

This case is slightly different from *Rith [Energy, Inc. v. United States,* 270 F.3d 1347 (Fed.Cir.2001) ] and *Appolo [Fuels, Inc. v. United States,* 54 Fed.Cl. 717 (2002) ] in that plaintiffs Cane and Colten are owned by an investor with no coal mining experience. The investor at issue had no experience negotiating SMCRA leases, and there was no mention of citizens petitions in any of the leases transferring property to Cane or Colten. Therefore, the court does not believe that the mere existence of the regulatory regime would put parties of plaintiffs' sophistication on actual notice that they were at risk of economic loss from an unsuitability petition.

The relationship between the actual expectations of a takings plaintiff and the reasonableness of those expectations has recently been addressed by the Federal Circuit. *Cienega Gardens,* 331 F.3d [at] 1319. In *Cienega Gardens,* the court determined that the takings plaintiffs' expectations "would not really be investment-backed unless they actually believed in a certain outcome and entered the program in reliance on it." *Id.* at 1346. The "first step" is an analysis of plaintiff's actual expectations "because [the court] re-

quire[s] actual expectation of, or reliance on the government not nullifying [plaintiff's] contractual and regulatory rights as a threshold matter." *Id.* If a plaintiff has an actual "expectation of, or reliance on" government action or inaction, as claimed by plaintiffs here, the court's focus turns to the reasonableness of those expectations. *Id.* at 1346.

*Cane,* 57 Fed.Cl. at 126–27.

The Federal Circuit observed in *Cienega Gardens* that:

> The purpose of consideration of plaintiffs' investment-backed expectations is to limit recoveries to property owners who can demonstrate that "they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor, [Inc. v. United States],* 28 F.3d [1171,] 1177 [(1994)]. This factor also incorporates an objective test—to support a claim for a regulatory taking, an investment-backed expectation must be "reasonable." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

*Cienega Gardens,* 331 F.3d at 1345–46. The Federal Circuit explained that the proper inquiry for the court "is *an objective, but fact-specific inquiry* into what, under all the circumstances, the [property] [o]wners should have anticipated." *Id.* at 1346 (emphasis added).

Assessing plaintiffs' reasonable investment-backed expectations in light of the Federal Circuit's guidance in *Cienega Gardens,* the court considered whether plaintiffs were reasonably unaware of the risks posed by the regulatory regime or, if plaintiffs were aware of the risks, whether they acted reasonably in proceeding without any diminished expectation with respect to their investment. In this case, the court stated in its Opinion that, based on the record evidence, "plaintiffs were aware of the permitting process under SMCRA." *Cane,* 57 Fed.Cl. at 127. The court added that "[w]hile [plaintiffs] should have been aware of the potential for the petition process that occurred here, they do not appear to have taken it into account." *Id.* Having determined that plaintiffs were

unaware of the petition process, the court examined the reasonableness of plaintiffs' ignorance.

On reconsideration, plaintiffs do not dispute that they were actually ignorant of the petition process. Rather, they argue that a genuine issue of material fact exists regarding whether "an unsuitability proceeding ... was objectively foreseeable." *See* Pls.' Mot. at 14 (emphasis omitted). The court's Opinion does indeed conclude that, at the time of plaintiffs' property purchase in 1979, an unsuitability proceeding was "objectively foreseeable" under SMCRA, 30 U.S.C. §§ 1201–1328, which was enacted in August 1977. Pub.L. 95–87, 91 Stat. 445 (1977); *see Cane,* 57 Fed.Cl. at 127. The court also concluded that plaintiffs' reliance on an economic assessment report as the principal basis for shaping its investment-backed expectations that SMCRA would not prohibit mining operations on its property was not reasonable under the circumstances here. *Cane,* 57 Fed.Cl. at 127.

The record indicates that the Behre Dolbear expert assessment referenced the permitting process "required" for the coal mining operation, specifically noting that the developer had not then obtained an "EPA water permit, surface mine permit or underground mine permit" for the proposed undertaking. Pls.' Ex. 6 at 101. The court considered the nature of that expert assessment in examining the reasonableness of plaintiffs' investment backed-expectations. As stated in its report, Behre Dolbear was retained to conduct "an independent economic assessment of the commercial viability of a coal mining operation on the property." Pls.' Ex. 6 at 75. The assessment was made by two mining engineers and an economic geologist. The report describes some of the firm's and its consultants' prior experience assessing coal properties "in the immediate area." *Id.* at 76. Apparently prepared without the benefit of legal counsel, the report provided an "optimistic assessment of the permit process." *Cane,* 57 Fed. Cl. at 127. Plaintiffs, however, were subsequently informed by their investment advisors at Citibank in a descriptive brochure prepared for plaintiffs that, among other in-

vestment risks, the "'required permits may not be attainable.'" *Id.* (quoting Pls.' Ex. at 127) (Cane Citibank brochure). Recognizing the possibility that plaintiffs might engage independent advisors to evaluate the investment advice, the Cane Citibank brochure noted the confidential nature of the document and expressly advised plaintiffs "to review it only with others with whom you have a present confidential relationship, such as your attorney, accountant, or tax advisor." Pls.' Ex. 7 at 127.

Based on the record and in the complete absence of any other evidence showing that plaintiffs received further advice—particularly legal counsel—with respect to the regulatory risks under SMCRA for plaintiffs' investment in the coal mining operation, the court was not persuaded that plaintiffs' expectations were, as they claimed, "'shaped in light of a full consideration of SMCRA.'" *Cane,* 57 Fed.Cl. at 127 (quoting Plaintiff's Cross–Motion at 41). On the contrary, the record showed that plaintiffs' expectations were shaped in light of a narrow consideration of SMCRA, specifically, the likelihood of obtaining certain permits. The court concluded that such limited consideration of the regulatory scheme governing the coal mining operation that plaintiffs sought to undertake was not consistent with the conduct of a reasonably prudent investor. *Id.*

Plaintiffs complain that "these subjects [the possibility of an unsuitability petition and whether such a possibility was objectively foreseeable] were never raised during the prior rounds of discovery ...." Pls.' Mot. at 14 n. 16. The court noted at oral argument on the parties' motions for partial summary judgment that "some supplementary briefing" and "some [additional] factual development" might be warranted. Transcript of Oral Argument on March 25, 2003(Tr.) at 146. On June 12, 2003, the Federal Circuit decided *Chancellor Manor v. United States,* 331 F.3d 891 (Fed.Cir.2003) and *Cienega Gardens v. United States,* 331 F.3d 1319 (Fed.Cir.2003). On June 23, 2003, the parties filed a Joint Notice of Citation of Supplemental Authorities noting, without accompanying argument or briefing, the rendering of the two Federal Circuit decisions. Upon re-

consideration, the court concludes that "supplementary briefing" and "[additional] factual development," Tr. at 146, are appropriate with respect to the investment-backed expectations prong of the court's *Penn Central* analysis in light of *Cienega Gardens.*

For the foregoing reasons, Plaintiffs' Motion for Reconsideration is GRANTED–IN–PART and DENIED–IN–PART. The parties shall submit a joint status report or, if they cannot agree, separate status reports, regarding proposed further proceedings in this case on or before October 24, 2003.

IT IS SO ORDERED.